596 N.W.2d 164 (1999)
460 Mich. 396
In re MCI TELECOMMUNICATIONS COMPLAINT Against Ameritech Michigan and GTE North Incorporated Relative To Their Not Making Intralata Equal Access Available To MCI In The State of Michigan.
Michigan Public Service Commission, MCI Telecommunications Corporation, AT & T Communications of Michigan, Inc., and Attorney General of the State of Michigan, Appellants,
v.
Michigan Bell Telephone Company, doing business as Ameritech Michigan, Appellee,
MCI Telecommunications Corporation, and AT & T Communications of Michigan, Inc. Plaintiffs-appellants, and
Michigan Public Service Commission and Attorney General of the State of Michigan, Intervening Plaintiffs-Appellants,
v.
Michigan Bell Telephone Company, doing business as Ameritech Michigan, Defendant-Appellee.
Nos. 112363, 112364, and 112367-112369, Calendar No. 12.
Supreme Court of Michigan.
Argued March 11, 1999.
Decided July 8, 1999.
*167 Jennifer M. Granholm, Attorney General, Thomas L. Casey, Solicitor General, J. Peter Lark and Orjiakor N. Isiogu, Assistant Attorneys General, Special Litigation Division, Lansing, for Michigan Public Service Commission and the state of Michigan.
Fischer, Franklin & Ford (by George Hogg, Jr., Arthur J. LeVasseur, and Sidney M. Berman ), Detroit, Joan Marsh and John J. Reidy, III, Chicago, of counsel, for AT & T Communications of Michigan Inc.; Dykema, Gossett, P.L.L.C. (by Albert Ernst and Lori M. Silsbury ), Lansing, and MCI Worldcom, Inc. (by William Single, IV, and Mark B. Ehrlich), of counsel, for MCI Telecommunications Corporation, Washington, D.C.
David A. Voges, Henry J. Boynton, and David M. Gadaleto, Assistant Attorneys General, Lansing, for Michigan Public Service Commission.
Dickinson, Wright, P.L.L.C. (by Joseph A. Fink, Peter H. Ellsworth, John M. Dempsey, Jeffery V. Stuckey, and Jennifer L. Frye ), Lansing, and Michael A. Holmes, Detroit, for appellee Ameritech Michigan. *165

*166 Opinion
MICHAEL F. CAVANAGH, J.
In these consolidated cases, we are called on to address whether Ameritech must provide intraLATA toll dialing parity regardless of whether it is afforded the opportunity to compete in the interLATA market, and to review the appropriateness of various Michigan Public Service Commission (PSC) orders that were entered to compel Ameritech to provide such parity. For the reasons discussed below, we reverse in part and affirm in part the *168 judgment of the Court of Appeals,[1] affirm several orders of the PSC, uphold the reversal of other orders of the PSC, and reverse the writ of mandamus issued by the Ingham Circuit Court.

I

A
We begin our review of the convoluted undertakings that form the basis of these actions with reference to the facts of this case as they were ably presented by Judge Smolenski in his opinion for the Court of Appeals, which we quote below.
This case concerns whether Ameritech is required to provide "intraLATA toll dialing parity" in the absence of "interLATA relief."
Before 1982, American Telephone and Telegraph Company, a provider of both local and long distance telephone service, dominated the telecommunications industry.1 The key to AT & T's domination was its control of local telephone service.2 AT & T provided local telephone service through its numerous Bell operating companies, one of which was Michigan Bell Telephone Company,3 now doing business as Ameritech.
1 United States v. American Telephone & Telegraph Co., 552 F.Supp. 131, 222 (D.D.C., 1982).
2 Id., n. 1 at 223.
3 Id., n. 2 at 139, n. 19, 228, 232.
In 1982, AT & T agreed to the entry of a consent decree entitled "Modification of Final Judgment" in federal court (the AT & T consent decree). See, generally, United States v. American Telephone & Telegraph Co., 552 F.Supp. 131 (D.D.C., 1982). For the purpose of ending AT & T's monopoly over local telephone service, the AT & T consent decree provided that AT & T would divest itself of its Bell operating companies.4 The AT & T consent decree provided that the Bell operating companies would be authorized to provide telephone service only within certain defined geographic regions generally corresponding to telephone area code regions called "local access transport areas." 5 (LATAs.)6 This service, called intraLATA service, includes local calls, i.e., typically telephone calls within a city or town, as well as toll calls, i.e., calls covering a distance beyond local calls but within the same LATA (intraLATA toll calls).7 However, the AT & T consent decree provided that the Bell operating companies were prohibited from providing interLATA service, i.e., telephone service between LATAs.8 The AT & T consent decree further provided that the interLATA prohibition could be removed when a Bell operating company showed that there was no substantial possibility that it could use its monopoly power to impede competition in the market it sought to enter.9 As a result, at least in part, of the AT & T consent decree, during the 1980s in Michigan a customer's intraLATA toll calls were carried by a local carrier such as Ameritech while a customer's interLATA calls were carried by an interexchange (long distance) carrier such as AT & T of Michigan or MCI.10
4 Id., at 141, 223, 226.
5 Id. at 141, 224, 227; see also Bell Atlantic-New Jersey, Inc. v. Tate, 962 F.Supp. 608, 611 (D.N.J., 1997); United States v. Western Electric Co., Inc., 569 F.Supp. 990, 993-994 (D.D.C., 1983); GTE North Inc. v. Public Service Comm., 215 Mich.App. 137, 140, 544 N.W.2d 678 (1996).
6 There are five LATAs in Michigan. GTE North, n. 5 supra.
7 Bell Atlantic-New Jersey, see also Western Electric, n. 5 supra.
8 AT & T Co., supra at 227; see Bell Atlantic-New Jersey, n. 5 supra; Western Electric, n. 5 supra; GTE North, n. 5 supra.
9 AT & T Co., supra at 195, 231.
10 Bell Atlantic-New Jersey, n. 5 supra; GTE North, n. 5 supra.
In the late 1980s, the PSC authorized AT & T of Michigan and MCI to begin *169 competing in the Michigan intraLATA toll market.11 However, in order for an interexchange carrier such as AT & T of Michigan or MCI to provide service for a customer's intraLATA toll call, the customer must dial a five-digit "10xxx" prefix to the number to be called, with the "xxx" being a three-digit identification code assigned to each interexchange carrier. The PSC allowed local carriers such as Ameritech to retain the use of what is termed "1 +" or "0 +" dialing, meaning that Ameritech provides service for a customer's intraLATA toll call when the customer adds only a single digit prefix (either a "1" or "0") to the number to be called.
11 GTE North, n. 5 supra.
These dialing arrangements are the root of this case. MCI and AT & T of Michigan do not like these dialing arrangements for intraLATA toll calls because they believe "1 +" and "0 +" dialing gives Ameritech a substantial competitive advantage in the intraLATA toll market. MCI and AT & T of Michigan want "intraLATA toll dialing parity," i.e., "uniform 1 + dialing arrangements for all intraLATA service by all providers...." However, Ameritech's position has always been that it should not be required to provide intraLATA toll dialing parity until it has been accorded "interLATA relief," i.e., the authority to compete in the interLATA market.
In July 1992, MCI commenced this proceeding in the PSC, U-10138, by filing a complaint alleging, in part, that Ameritech was violating various provisions of the Michigan Telecommunications Act, 1991 P.A. 179, M.C.L. § 484.2101 et seq.; MSA 22.1469(101) et seq. (Act 179 or the MTA), by failing to make intraLATA toll dialing parity available to MCI. At some point, the Attorney General and AT & T of Michigan intervened in this proceeding. Although finding that Ameritech's failure to provide intraLATA toll dialing parity did not violate Act 179, the PSC ultimately determined that implementation of intraLATA toll dialing parity was in the public interest and, in a February 1994 decision, ordered Ameritech to implement intraLATA toll dialing parity in Michigan "no later than January 1, 1996." The decision also provided that a task force would be established to work out the procedures for implementing intraLATA toll dialing parity. Ameritech moved for a rehearing and reconsideration, which was denied by the PSC in a July 1994 decision.
After the task force submitted a report to the PSC containing certain recommendations and noting certain disputed issues, the PSC issued a March 1995 decision in which it ordered Ameritech to begin implementing intraLATA toll dialing parity on January 1, 1996, in those offices in which it was technically possible to do so and to adopt a firm schedule for converting to intraLATA toll dialing parity for those offices in which it was not technically possible to do so by January 1, 1996. The decision also provided that a fifty-five percent discount on access charges would be imposed on those offices that did not meet the schedule for converting to intraLATA toll dialing parity. Access charges apparently are paid by an interexchange carrier such as AT & T of Michigan and MCI to a local carrier such as Ameritech for the interexchange carrier's use of the local carrier's local network during the initial and final link of an intraLATA toll call serviced by the interexchange carrier. In imposing the discount, the PSC rejected the contention that the discount was a penalty. The PSC reasoned that the discount was warranted because nonconverted access services whereby customers would have to continue to dial five-digit access codes plus the number to be called in order for an interexchange carrier to service an intraLATA toll call were of lesser quality than converted access services *170 whereby an interexchange carrier would service the call simply when customers dialed a one-digit prefix plus the number to be called.
Effective November 30, 1995, the Legislature enacted 1995 P.A. 216, M.C.L. § 484.2101 et seq.; MSA 22.1469(101) et seq. (Act 216 or the MTA), which substantially amended and added several new sections to the MTA. In particular, Act 216 added § 312a and § 312b, both of which specifically addressed the implementation of intraLATA toll dialing parity in Michigan:
"Sec. 312a. Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver.
"Sec. 312b. (1) Except as otherwise provided in subsection (2) or (3), a provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity and shall provide inter-LATA toll service to an equal percentage of customers within the same service exchange on the following dates:
"(a) To 10% of the customers by January 1, 1996.
"(b) To 20% of the customers by February 1, 1996.
"(c) To 30% of the customers by March 1, 1996.
"(d) To 40% of the customers by April 1, 1996.
"(e) To 50% of the customers by May 1, 1996.
"(2) If the inter-LATA prohibitions are removed, the commission shall immediately order the providers of basic local exchange service to provide 1 + intra-LATA toll dialing parity.
"(3) Except for subsection (1)(a), subsection (1) does not apply to the extent that a provider is prohibited by law from providing either 1 + intra-LATA toll dialing parity or inter-LATA toll service as provided under subsection (1).
"(4) Except as otherwise provided by this section, this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995.
"(5) The commission shall immediately take the necessary actions to receive the federal waivers needed to implement this section.
"(6) This section does not apply to a provider of basic local exchange service with less than 250,000 access lines."
Section 312a was enacted with a repeal date of January 1, 2001, while § 312b was enacted with a repeal date of July 1, 1997. The Legislature defined the statutory phrase "inter-LATA prohibitions" in relevant part to mean "the prohibitions on the offering of ... inter-LATA service contained in the modification of final judgment entered pursuant to [the AT & T consent decree]."
In response to the enactment of § 312b, Ameritech provided intraLATA toll dialing parity to only ten percent of its customers after January 1, 1996.
On February 8, 1996, Congress enacted § 271 of the Federal Telecommunications Act of 1996 (the FTA), 47 U.S.C. 271, which addresses a Bell operating company's implementation of intraLATA toll dialing parity and entry into the interLATA market in the following relevant respects:
"(a) General limitation. Neither a Bell operating company, nor any affiliate of a Bell operating company, may provide interLATA services except as provided in this section.

* * *
"(e) Limitations.

* * *
"(2) IntraLATA toll dialing parity.
*171 "(A) Provision required. A Bell operating company granted authority to provide interLATA services ... shall provide intraLATA toll dialing parity throughout that State coincident with its exercise of that authority.
"(B) Limitation. Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity, a State may not require a Bell operating company to implement intraLATA toll dialing parity in that State before a Bell operating company has been granted authority under this section to provide interLATA services originating in that State or before 3 years after February 8, 1996, whichever is earlier. Nothing in this subparagraph precludes a State from issuing an order requiring intraLATA toll dialing parity in that State prior to either such date so long as such order does not take effect until after the earlier of either such dates.
"(f) Exception for previously authorized activities. Neither subsection (a) of this section nor section 273 of this title shall prohibit a Bell operating company or affiliate from engaging, at any time after February 8, 1996, in any activity to the extent authorized by, and subject to the terms and conditions contained in, an order entered by the United States District Court for the District of Columbia pursuant to section VII or VIII(C) of the AT & T consent decree if such order was entered on or before February 8, 1996, to the extent such order is not reversed or vacated on appeal. Nothing in this subsection shall be construed to limit, or to impose terms or conditions on, an activity in which a Bell operating company is otherwise authorized to engage under any other provision of this section."
The term "Bell operating company" is defined to include Michigan Bell Telephone Company. 47 U.S.C. 153(4). The term "AT & T consent decree" in § 271(f) is defined as an order entered pursuant to the decree entered in AT & T Co., supra. 47 U.S.C. 153(3). The phrase "[except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity" in § 271(e)(2)(B) is known as the "Breaux-Leahy Amendment." Bell Atlantic-New Jersey, Inc. v. Tate, 962 F.Supp. 608, 613 (D.N.J., 1997). The amendment was designed to avoid the generally preemptive effect of § 271(e)(2)(B) and allow states such as Michigan that had ordered intraLATA toll dialing parity by December 19, 1995, to proceed to effectuate that requirement after that date. Id.; see also 141 Cong. Rec., S. 8349 (daily ed., June 14, 1995) (statement of Sen. Leahy). The amendment has also been referred to as a "grandfather clause." Bell Atlantic-New Jersey, supra.
In May 1996, MCI and AT & T of Michigan moved in the PSC to compel Ameritech to comply with the PSC's previous orders concerning full implementation of intraLATA toll dialing parity. Relying on the language in § 312b(4) that "this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995," MCI and AT & T of Michigan reasoned that the expiration of the January 1 to May 1, 1996, statutory phase-in schedule contained in § 312b(1) meant that the PSC's 1994 and March 1995 orders were once again fully effective and that the time frames for implementing intraLATA toll dialing parity set forth in those orders must now be met.
In response, Ameritech contended that § 312b constituted a statutory plan linking intraLATA toll dialing parity with interLATA relief. Ameritech cited § 312b(3) for the proposition that "unless and until" it was allowed to provide interLATA service, it was statutorily obligated to provide intraLATA toll dialing *172 parity to only ten percent of its customers.
In a June 1996 decision, the PSC ordered Ameritech, within thirty days, to provide intraLATA toll dialing parity and implement the fifty-five percent discount on access charges pursuant to the PSC's 1994 and March 1995 orders. The PSC rejected Ameritech's contention that § 312b was intended to link intraLATA toll dialing parity with interLATA relief. The PSC accepted MCI's and AT & T of Michigan's contention that § 312b was intended to provide only a partial and temporary reprieve from the PSC's conversion schedule. In so ruling, the PSC reasoned that § 312b was ambiguous. The PSC resolved the perceived ambiguity by considering the language of § 312b, its legislative history, and its practical effect.
With respect to the language of § 312b, the PSC noted that, had the Legislature intended to link intraLATA toll dialing parity with interLATA relief, it could have done so in either of two ways. First, the PSC noted that the absence of the operative phrase relied on by Ameritech ("unless and until") casts serious doubt on Ameritech's claim that the Legislature intended to indefinitely suspend the toll dialing parity conversion schedule once conversion reached ten percent. Second, the PSC noted that
"the phrase `no more than' could have been inserted before each of the numerical percentages found in subsection (1)(a) through (1)(e) of Section 312b, thus clearly expressing that the maximum scope of dialing parity that Ameritech Michigan could be required to provide (at least until all federal prohibitions on providing interLATA toll service are lifted) was 50%. However, neither that nor any similar phrase was included in the Act. Therefore, the language in Section 312b(1), when given its plain meaning, appears to set a minimum, rather than a maximum, pace for Ameritech Michigan's conversion to dialing parity. This conflicts with Ameritech Michigan's interpretation of the Act."
The PSC also noted that the July 1, 1997, expiration of § 312b simply removed any doubt that one hundred percent intraLATA toll dialing parity was consistent with the Legislature's intent.
The PSC also found that the legislative history of § 312b did not support Ameritech's argument that the Legislature intended to link intraLATA toll dialing parity with interLATA relief. In so finding, the PSC quoted part of an early Senate version of § 312a:
"Until the inter-LATA prohibitions are removed for providers of basic local exchange service, a provider of basic local exchange service is not required to provide 1 + intra-LATA toll dialing parity. If the inter-LATA prohibitions are removed, then a provider of basic local exchange service shall offer to other providers 1 + intra-LATA toll dialing parity. [SB 722, as passed by the Senate on October 26, 1995.]"
The PSC found that the Legislature's failure to ultimately enact this language as part of § 312a and § 312b meant that the Legislature did not intend to absolutely link intraLATA toll dialing parity with interLATA relief. The PSC also noted:
"As initially written, Section 312b(4) retained the effectiveness of all Commission orders regarding dialing parity issued before June 30, 1995. See House Public Utility Committee substitute, H-1, to Senate Bill No. 722; 1995 Journal of the House 2651 (No. 82, November 7, 1995). However, that date was in conflict with the June 1, 1995 cut-off being considered by Congress in legislation that eventually became the federal Telecommunications Act of 1996. This created the possibility that the Commission's orders concerning dialing parity might not be considered `grandfathered' and that Michigan, like a majority of the *173 states, would be precluded for up to three years from requiring Ameritech Michigan to implement dialing parity unless the company first received authority to provide interLATA toll service.
"To avoid that result, the language of Section 312b(4) was amended by replacing `June 30, 1995' with `June 1, 1995.' Id. at 2654. In making that change, the Legislature ensured (1) that the removal of interLATA prohibitions would not become a condition precedent to requiring Ameritech Michigan to provide intra-LATA dialing parity, and (2) that prior Commission orders requiring the comprehensive implementation of dialing parity would not be overturned by the new federal law. The legislative history of Section 312b(4) thus supports the construction advocated by MCI and AT & T...."
Finally, the PSC noted that implementation of intraLATA toll dialing parity was in the public interest and that Ameritech's construction of § 312b conflicted with the MTA's goals of encouraging competition and new providers.
Ameritech moved for a rehearing. In an October 1996 decision, the PSC denied rehearing and ordered Ameritech to immediately provide intraLATA toll dialing parity and implement the fifty-five percent discount on access charges in unconverted offices in accordance with the PSC's 1994, March 1995, and June 1996 orders.
In November 1996, Ameritech timely filed with [the] Court [of Appeals] a claim of appeal from the PSC's October 1996 order (Docket No. 198706). That same day, AT & T Communications of Michigan and MCI filed a complaint against Ameritech in the circuit court, seeking a writ of mandamus compelling Ameritech to comply with the PSC's toll dialing parity orders. Following oral argument, but without considering the statutory language of § 312b or otherwise making any findings of fact or conclusion of law, the circuit court issued an order directing that the requested writ of mandamus be issued. The order directed Ameritech to comply with the PSC's intraLATA toll dialing parity orders in "conformance with the implementation schedule ordered by the Commission." Ameritech then filed a timely claim of appeal in [the] Court [of Appeals] from the circuit court's order (Docket No. 199383). In December 1996, [the] Court [of Appeals] entered a stay of further proceedings in Docket No. 198706 (Ameritech's appeal of the PSC's October 1996 order) "pending resolution of this appeal or further order of th[e] Court [of Appeals]." In January 1997, [the] Court [of Appeals] consolidated Ameritech's appeals.

B
Following consideration of the aforementioned consolidated appeals, the Court of Appeals reversed. 229 Mich.App. 664, 583 N.W.2d 458 (1998). In doing so, the Court of Appeals found that the language of § 312a and § 312b unambiguously mandated the conclusion reached by that court. Additionally, the Court of Appeals reversed the Ingham Circuit Court's grant of an order of mandamus, and further taxed costs pursuant to MCR 7.219 in favor of Ameritech, it being the prevailing party.
AT & T Communications of Michigan, Inc., and MCI Telecommunications Corporation filed a joint application for leave to appeal to this Court. The Attorney General and the PSC also filed applications for leave to appeal to this Court. This Court subsequently granted leave to appeal[2] and heard oral argument. Following oral argument, appellee Ameritech offered supplemental submissions advocating that the issues before the Court had become moot in light of recent developments. Various appellants responded in opposition. For the reasons detailed below, we reverse the *174 decision of the Court of Appeals, and reinstate certain orders of the PSC and the Ingham Circuit Court.

II
The various appellants frame a multitude of questions for presentation to this Court. Given that we find the answers to certain of these questions to be determinative with respect to the remaining matters encompassed in these cases, we will address such questions in their logical order, rather than their order of presentation.

A
We first address the statutory authority of the PSC to exercise jurisdiction over intraLATA toll dialing parity issues. In addressing this issue, three sections of the Michigan Telecommunications Act (MTA) are relevant. Sections 312a and 312b were quoted above, and the third relevant section is § 604(2) of that act, stated as follows:
Section 312b of Act No. 179 of the Public Acts of 1991, being section 484.2312b of the Michigan Compiled Laws, is repealed effective July 1, 1997. [MCL 484.2604(2); MSA 22.1469(605)(2).]
Our first task is one of statutory construction. In essence, we must examine the statutory sections in question to determine whether the Legislature granted the PSC jurisdiction to issue orders regarding intraLATA toll dialing parity such as those contested here. The primary goal of statutory interpretation is to give effect to the intent of the Legislature. Farrington v. Total Petroleum, Inc., 442 Mich. 201, 212, 501 N.W.2d 76 (1993). The first step in that determination is to review the language of the statute itself. House Speaker v. State Administrative Bd., 441 Mich. 547, 567, 495 N.W.2d 539 (1993). If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible. Lorencz v. Ford Motor Co., 439 Mich. 370, 376, 483 N.W.2d 844 (1992). Should a statute be ambiguous on its face, however, so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning. Sam v. Balardo, 411 Mich. 405, 418, 308 N.W.2d 142 (1981); Heinz v. Chicago Road Investment Co., 216 Mich. App. 289, 295, 549 N.W.2d 47 (1996).
While the Court of Appeals demonstrated that it was clearly cognizant of these rules of interpretation, it also noted an additional rule, the applicability of which will be addressed immediately below. In general, where statutes relate to the same subject matter, they should be read, construed, and applied together to distill the Legislature's intent. Empire Iron Mining Partnership v. Orhanen, 455 Mich. 410, 427, 565 N.W.2d 844 (1997). After citing this rule, the Court of Appeals set about the task of statutory interpretation regarding § 312a and § 312b. Recall the text of the statutes:
Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver. [MCL 484.2312a; MSA 22.1469(312a).]
(1) Except as otherwise provided in subsection (2) or (3), a provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity and shall provide inter-LATA toll service to an equal percentage of customers within the same service exchange on the following dates:
(a) To 10% of the customers by January 1, 1996.
(b) To 20% of the customers by February 1, 1996.
(c) To 30% of the customers by March 1, 1996.

*175 (d) To 40% of the customers by April 1, 1996.
(e) To 50% of the customers by May 1, 1996.
(2) If the inter-LATA prohibitions are removed, the commission shall immediately order the providers of basic local exchange service to provide 1 + intra-LATA toll dialing parity.
(3) Except for subsection (1)(a), subsection (1) does not apply to the extent that a provider is prohibited by law from providing either 1 + intra-LATA toll dialing parity or inter-LATA toll service as provided under subsection (1).
(4) Except as otherwise provided by this section, this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995.
(5) The commission shall immediately take the necessary actions to receive the federal waivers needed to implement this section.
(6) This section does not apply to a provider of basic local exchange service with less than 250,000 access lines. [MCL 484.2312b; MSA 22.1469(312b).]
The Court of Appeals, when analyzing these sections, found:
When these sections are construed together, we do not find the plain language of § 312a and § 312b to be ambiguous. Specifically, under § 312a, a local carrier must provide intraLATA toll dialing parity for a particular area "if a waiver to the inter-LATA prohibitions [contained in the AT & T consent degree] has been granted for a specific service area and the service area has 2 or more providers of local exchange service...." [229 Mich.App. at 685, 583 N.W.2d 458.]
Questions of statutory interpretation are questions of law, which will be reviewed de novo. Cardinal Mooney High School v. Michigan High School Athletic Ass'n, 437 Mich. 75, 80, 467 N.W.2d 21 (1991). In analyzing the meaning of § 312a, we begin with the language of § 312a itself. House Speaker, supra. Without question, § 312a clearly states that the provider of basic local exchange service (Ameritech) is to offer intraLATA toll dialing parity within its service area if it is granted a waiver to provide interLATA service. However, on the face of § 312a's language, there is nothing that would indicate that the reverse is inherently true or required. Indeed, while the statute specifically requires that, should interLATA service be allowed to Ameritech, Ameritech must provide intraLATA toll dialing parity, there is no limitation in the statute that such intraLATA toll dialing parity could only be provided if interLATA service was permitted.
Reviewing the language of the statute, it is apparent that for § 312a to have the meaning imposed upon it by the Court of Appeals and advocated by Ameritech, the Court would need to infer additional language, not present on its face. Indeed, it would seem that, for the statute to require the effect advocated by Ameritech, it would have to contain additional language such as in the example below, where the unitalicized portion represents the statute, as written by the Legislature, and the italicized portion represents the addition that would apparently be necessary for the statute to hold, on its face, the meaning given to it by the Court of Appeals:
Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver. A provider of basic local exchange service may not be required to provide intra-LATA toll dialing parity until it has been granted a waiver to the inter-LATA prohibitions.

It is a maxim of statutory construction that every word of a statute should be read in such a way as to be *176 given meaning, and a court should avoid a construction that would render any part of the statute surplusage or nugatory. Altman v. Meridian Twp., 439 Mich. 623, 635, 487 N.W.2d 155 (1992). Likewise, a court should refrain from speculating about the Legislature's intent beyond the words employed in the statute. City of Lansing v. Lansing Twp., 356 Mich. 641, 648-649, 97 N.W.2d 804 (1959). Accordingly, we cannot agree with the Court of Appeals construction of § 312a.
Moreover, it is apparent from the history of § 312a that the Legislature specifically considered adding the language that would be required to give the statute the meaning urged by Ameritech and granted by the Court of Appeals, and rejected doing so. In the course of consideration of the MTA, the Michigan Senate, on October 26, 1995, passed S.B. 722 (the Senate version of what would eventually become 1995 P.A. 216, MTA), which included a version of § 312a that concluded with the following language:
"[U]ntil the inter-LATA prohibitions are removed for providers of basic local exchange service, a provider of basic local exchange service is not required to provide 1 + intra-LATA toll dialing parity.
However, as can be seen from the current version of § 312a, which was ultimately signed into law on November 30, 1995, such language is not present in the version of the statute as enacted. Where the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected. The express mention of one thing in a statute implies the exclusion of other similar things. Jennings v. Southwood, 446 Mich. 125, 142, 521 N.W.2d 230 (1994).
Accordingly, we find the meaning of § 312a, standing alone, to be unambiguous on its face. The statutory language clearly requires that, should interLATA prohibitions be removed, Ameritech must provide intraLATA toll dialing parity. There is, however, nothing on the face of this statute, or within the language enacted by the Legislature, that would hold the reverse to be true. Indeed, where the Legislature specifically considered language authorizing such a linkage, and rejected it, the Court of Appeals clearly erred in holding that the statute inextricably linked intraLATA and interLATA toll dialing parity. Rather, the statute requires intraLATA toll dialing parity, where interLATA service is permitted, but does not require the reverse.

B
The Court of Appeals, in reaching its construction of the statute, relied on a reading of § 312a in conjunction with § 312b. In general, we recognize the rule that statutes relating to the same subject matter should be read and construed together to determine the Legislature's intent. Empire Iron Mining Partnership, supra. In this case, however, the relationship of § 312a and § 312b is compounded by the existence of § 604(2), which repealed § 312b effective July 1, 1997. While the Court of Appeals was not unaware of this section, it appears from the face of its decision that the repeal of § 312b played no part in its analysis of the relationship between § 312a and § 312b. We disagree with such a view, and find that, given the expiration of § 312b, the Court of Appeals reliance on § 312b to determine the effect of § 312a, particularly as applied to occurrences after July 1, 1997, clearly was error.
The Court of Appeals held that, under § 312b, the local carrier (Ameritech) has an unconditional obligation to provide intraLATA toll dialing parity and interLATA service to ten percent of customers by January 1, 1996. The Court of Appeals further held that the plain language of the statute required that, except for the initial ten percent of customers, "the Legislature intended that Ameritech provide intraLATA toll dialing parity when the conditions *177 specified in § 312a and § 312bprimarily interLATA reliefwere satisfied." 229 Mich.App. at 686, 583 N.W.2d 458.
We find several problems with this analysis. In the first instance, while § 312a and § 312b clearly relate to similar subject matter, it would appear from their faces that they have different intents. Section 312a clearly mandates that Ameritech must provide intraLATA toll dialing parity if and when interLATA relief is granted. Section 312b, however, sets forth a schedule of implementation of intraLATA toll dialing parity that is paired with interLATA service, requiring both to be provided in a progressive fashion, subject to various limitations outlined in the section.
Second, and of even greater importance, is the fact that the Legislature included in its amendments of the MTA the repealing provision of § 604(2), which repeals § 312b as of July 1, 1997. The essence of the Court of Appeals holding is to find that, in view of the similar nature of the material to which they apply, §§ 312a and 312b must be read together. The effect of such a reading is to allow § 312b to continue in application today in direct contravention of the Legislature's clearly expressed intent that § 312b should expire effective July 1, 1997. We cannot endorse a construction that would render meaningless the Legislature's enactment of § 604(2), and thus must find the construction below to be in error. Altman, supra.

C
Appellee Ameritech argues that the effect of § 312b was in the nature of a repeal of the prior PSC orders and, further, that such orders are legislative in character. Ameritech then relies on the rule that repeal of a repealing act does not revive the previously repealed legislation to argue that the demise of § 312b should not result in the resuscitation of the PSC's prior orders. While we agree that fixing and regulating utility rates is a legislative function, Detroit v. Public Utilities Comm., 288 Mich. 267, 287, 286 N.W. 368 (1939), and that the repeal of a repealing act does not reinstate the legislation first repealed, see M.C.L. § 8.4; MSA 2.213; Jackson v. Corrections Comm., 313 Mich. 352, 21 N.W.2d 159 (1946), we are not persuaded that appellee's somewhat strained analogy is controlling when applied to PSC orders, which are an exercise of discretionary authority delegated by the Legislature, rather than being themselves enactments of the Legislature.
Even if we were so convinced, this argument fails to address the validity of § 312b(4), which, while it existed, on its face proclaimed that it left unaffected any PSC order regarding intraLATA dialing parity issued before June 1, 1995, except as otherwise provided by the statute. The statute, by operation of its language in § 312b(4), expressly left unaffected the PSC's prior orders, except as they conflicted with the implementation scheme outlined in the statute. There exists nothing within the text of § 312b that would act to prohibit the PSC from ordering dialing parity after July 1, 1997. On that date, § 312b expired, and there remained no statutory constraints whatsoever on the PSC. Thus, the PSC was free from that point forward to order intraLATA dialing parity.
It is apparent from the language of the statute that, rather than acting as a repeal of prior PSC orders, the statute specifically preserved those orders, except as they conflicted with the statutory implementation schedule. That implementation schedule, in existence only until July 1, 1997, while offering a temporary respite from the PSC's assertion of jurisdiction in such matters, shows no indications that the Legislature intended it to either adversely effect the prior PSC orders (except as necessitated by its own operation), given § 312b(4)'s preservation clause, or to prospectively affect intraLATA dialing parity regulation by the PSC, given its expiration date. Accordingly, we see no indication that the statute intended to repeal the prior PSC orders, and hence hold that, *178 other than that period during which § 312b superseded their implementation provisions with the Legislature's preferred implementation schedule, those orders remained viable, and the PSC was free to exercise its authority by way of them after the expiration of § 312b (on July 1, 1997).

D
While the language of § 312a is, on its face, unambiguous, and hence we need only apply it as written, Lorencz, supra, the effect of § 312b, and of its subsequent expiration, presents ambiguities regarding how the statute will apply to the situation before us, particularly when various possibilities contemplated on the face of the statute have not come to pass. Accordingly, we are required to construe the statute in an effort to give effect to the Legislature's intent. Heinz and Farrington, supra. Our efforts to construe the effect of these statutes must include consideration of their relationship to each other and the similar subject matter in a manner that is cognizant of the July 1, 1997, expiration of § 312b. In doing so, we are able to apply the language of the statute to the facts before us and reach the following conclusions regarding its effects.[3]
The nature of § 312a is to require intraLATA dialing parity if interLATA prohibitions are removed. The nature of § 312b, by virtue of its prospectively limited life span, is to temporarily provide local exchange services (i.e., Ameritech) with some relief from the PSC's prior orders (the February 1994 and March 1995 orders in particular), that would otherwise have required the local carriers to implement dialing parity no later than January 1, 1996 (later modified by the March 1995 order to make allowances for those areas where implementation of dialing parity was not technologically possible on January 1, 1996).
Section 312b accomplished this by means of the implementation schedule of § 312b(1), whereby the Legislature replaced the PSC's deadline of January 1, 1996, with its own sliding scale of deadlines, requiring a progressive implementation of both intraLATA parity and interLATA service. Section 312b(2), reflecting adherence to the mandate of § 312a, explicitly required the PSC to order full dialing parity if the interLATA prohibitions on the local carrier(s) were removed, and hence the abandonment of § 312b(1)'s schedule should those prohibitions be removed. Section 312b(3) provided an exception for all but ten percent of a local carrier's customers if the local carrier was prohibited by law from providing either intraLATA parity or interLATA toll service. Lastly, § 312b(4) provided that, except as otherwise provided in § 312b, any PSC order issued before June 1, 1995 (i.e., the February 1994 and March 1995 orders) were not altered or voided.
Thus, the effect of the Legislature's enactment of § 312b was to provide local carriers such as Ameritech with some temporary relief from the most demanding provisions (i.e., the implementation timetable) of the prior PSC orders. The Legislature, by enacting § 604(2), evidenced a judgment that such relief should be only temporary in nature, expiring on July 1, 1997. By enacting § 312b(4), the Legislature evidenced its intent to leave intact those parts of the prior PSC orders not specifically altered by § 312b. The essence of the alterations to such orders occurs by way of § 312b(1)(a)-(e)'s schedule.
*179 The last implementation requirement, on the sliding scale of this subsection, is § 312b(1)(e)'s requirement that intraLATA dialing parity and interLATA service be provided to fifty percent of a local exchange carrier's customers by May 1, 1996.
There is no requirement in § 312b(1) for the provision of dialing parity or interLATA service for any increased percentage of customers beyond May 1, 1996. Thus, it must appear that the Legislature may have envisioned that any one of three things would occur. First, the statute would permit the provision of an additional percentage of service and parity beyond fifty percent, but not require it. For reasons it need not justify, the Legislature may have determined that requiring only fifty percent parity was an appropriate policy. Second, the statute requires the immediate provision of dialing parity once interLATA prohibitions are lifted. It may be that the Legislature contemplated this would occur either by the time fifty percent of the customers were receiving such service, or by, or shortly after, May 1, 1996. There is, however, no need for us to speculate about the Legislature's intent, given the existence of a third possibility under the statute, the one which has come to pass.
In what actually occurred, not only did May 1, 1996, come and go without significant changes on the dialing parity front, but so did July 1, 1997. On that day, the effect of the Legislature's enactment of the repealing provision of § 604(2) was to withdraw from the field the Legislature's sliding scale of § 312b(1) and return the matter of dialing parity implementation to the PSC's jurisdiction.
During the life of § 312b, the interLATA restrictions on local carriers were not entirely removed. Thus, the mandate evidenced in § 312a, and its implementing directive in § 312b(2), requiring full dialing parity in the event of interLATA competition being permitted, never came to fruition.
Furthermore, the regulations on interLATA competition were not sufficiently relaxed to permit the matching sliding schedule of intraLATA parity and interLATA service envisioned by § 312b(1). Thus, by operation of § 312b(3), only the scheduling requirement of § 312b(1)(a) actually came to be mandated by the statute, that being the provision of intraLATA parity to ten percent of a local exchanges customers.
Thus, we reject the construction of the statute rendered by the Court of Appeals. We must also reject, however, appellants' contention that May 1, 1996, is a determinative date under § 312b(1)'s scheme. While that date evidenced the last deadline to be met under the Legislature's sliding scale, not until § 312b was repealed, on July 1, 1997, did the Legislature return to the PSC discretion over the setting of a dialing parity implementation schedule. Accordingly, the PSC orders of June 26, 1996, and October 7, 1996 ("the 1996 orders") that purported to regulate dialing parity implementation while that was controlled by § 312b were unlawful.
Section 312a clearly requires intraLATA parity if interLATA competition is allowed. The statute plainly does not, on its face, require the reverse. While § 312b evidenced a legislative intent to provide local exchange carriers (such as Ameritech) with some temporary relief from complying with the dialing parity implementation schedules set by orders of the PSC, and, until July 1, 1997, to replace such schedules with one of the Legislature's own design, § 312b was repealed effective July 1, 1997. The result of this repeal was to return to the PSC jurisdiction related to dialing parity implementation, and the PSC was, at that time, free to enforce the dialing parity schedule as it had enunciated in its previous (1994 and 1995) orders, the effect of which had been temporarily halted by the Legislature, but not specifically voided.
While the complexity of this case requires us to undertake a fairly exhaustive *180 review of the interworkings of this statute,[4] we conclude that the PSC adopted a view of the statute generally consistent with its intent and purpose, with the exception of its attempts to issue orders in June 1996 and October 1996, when § 312b had deprived it of the authority to do so. As a matter of state law, the PSC was empowered, as of July 1, 1997, to have jurisdiction over the implementation of intraLATA dialing parity and to enforce its prior (1994 and 1995) orders, which had been the subject of temporary legislative relief to the appellee, but which had not, by the clear language of the statute, been voided by the Legislature. We thus reverse the judgment of the Court of Appeals with respect to this issue.

III
We turn next to the question of the PSC's setting of a fifty-five percent discount on access charges by local exchange carriers (i.e., Ameritech) to interexchange carriers (i.e., AT & T and MCI) for access to those exchanges where intraLATA parity is not provided.

A
In reviewing the PSC's imposition of a fifty-five percent discount on access charges, the Court of Appeals relied entirely on its application of § 312b and § 312a. Indeed, the Court's analysis was sufficiently brief to allow us to quote it in its entirety:
Ameritech also contends that this Court must reverse the PSC's imposition of a fifty-five percent discount on access charges. We agree. In the 1996 orders, the PSC ordered that Ameritech implement the fifty-five percent discount in those offices that did not convert to intraLATA toll dialing parity pursuant to the schedule set forth in the PSC's 1994 and March 1995 orders. However, as previously explained, we have determined that the intraLATA toll dialing parity implementation schedule contained in the PSC's 1994 and March 1995 orders was rendered void to the extent that this schedule conflicted and continues to conflict with § 312b, repealed effective July 1, 1997, and § 312a. We have also determined that the PSC's 1996 orders requiring Ameritech to comply with the void implementation schedule were unlawful or unreasonable. Under these circumstances, we likewise conclude that the imposition of a fifty-five percent discount on access charges was also unlawful or unreasonable. [229 Mich.App. at 701-702, 583 N.W.2d 458 (citation omitted).]
As can be seen above, the Court of Appeals placed primary reliance on its prior analysis regarding the interrelation of § 312b and § 312a. As detailed above, we agree that, before its expiration on July 1, 1997, § 312b operated to provide local access carriers such as the appellee with relief from what would otherwise be their required compliance with the PSC's implementation schedule. The Court of Appeals decision, however, was issued in May 1998, and, while recognizing the repeal of § 312b, nonetheless speaks of the PSC's schedule as one that "conflicted and continues to conflict" with § 312b and § 312a. Id. at 701, 583 N.W.2d 458. As noted in part II, the plain language of § 312a holds no such conflict, and, as of July 1, 1997, and continuing on to the date of the Court of Appeals decision and even until today, there is no such conflict with § 312b for the simple reason that, as of July 1, 1997, § 312b was repealed and thus ceased to exist.
*181 Accordingly, while we must agree with appellee that, from the time of its effective date (November 30, 1995) until its repeal (July 1, 1997), § 312b operated to deprive the PSC of authority to enforce an implementation schedule for intraLATA dialing parity different from the one outlined in § 312b, the same cannot be said about any date following the repeal of § 312b. We thus must consider whether the PSC's fifty-five percent discount can be applied to access charges both before the effective date of § 312b and from July 1, 1997 forward.[5]
The PSC established this discount rate in its March 10, 1995, order. Subsequently, the order imposing the discount rate was affirmed by the Court of Appeals in an unpublished decision of that Court.[6] Ameritech did not apply to this Court for leave to appeal from that decision. The PSC's restatement of this requirement in its June 1996 order led to the inclusion by Ameritech of this issue in its appeal of that order.

B
Our standard of review of a decision of the PSC is provided by statute:
In all appeals under this section the burden of proof shall be upon the appellant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable. [MCL 462.26(8); MSA 22.45(8).]
Against this background, we have held:
To declare an order of the commission unlawful there must be a showing that the commission failed to follow some mandatory provision of the statute or was guilty of an abuse of discretion in the exercise of its judgment. Giaras v. Public Service Comm., 301 Mich. 262, 269, 3 N.W.2d 268 (1942).
The hurdle of unreasonableness is equally high. Within the confines of its jurisdiction, there is a broad range or "zone" of reasonableness within which the PSC may operate. Michigan Bell Telephone Co. v. Public Service Comm., 332 Mich. 7, 26-27, 50 N.W.2d 826 (1952). Cognizant of these confines, we proceed onward.

C
In its prior decision, the Court of Appeals addressed this matter in the following fashion:
We find no merit to Ameritech's objections to the 55% discount access rate that the PSC adopted for those end offices that do not meet the cutover date in the conversion schedule. Although the task force report characterizes the discount rate as a "penalty," the PSC's March 10, 1995 decision clarifies that the PSC adopted the measure as a rate-making provision rather than a penalty based upon a determination that the inferior quality of non-converted access services warranted the proposed lower access rate:
"The Commission finds that Ameritech Michigan's and MECA's [Michigan Exchange Carriers Association] arguments should be rejected for three reasons. First, in advancing their arguments, MECA and Ameritech Michigan mischaracterize the proposed discount as a penalty. To the contrary, the discount reflects the fact that there are different levels of service that warrant different pricing. Here, the access that will be provided in offices that do not convert to intraLATA dialing parity as scheduled requires the dialing of access codes, which is different from dialing a *182 single digit. Second, because the parties disagree on the issue, the Commission has the authority, pursuant to Section 310(7) of Act 179, to set access rates. Third, the Commission is persuaded that a discount will serve as an economic incentive for Ameritech Michigan and GTE to meet the conversion schedule. The Commission therefore concludes that a 55% discount on switched access charges in those end-offices that do not meet the cutover date in the conversion schedule should be adopted."
Ameritech does not directly challenge the soundness of the PSC's conclusion that the lack of scheduled dialing parity access service offered by the offices that do not comply with the conversion schedule may justify a discounted rate. Rather, Ameritech challenges the discount rate solely on procedural grounds, essentially arguing that the PSC cannot use its ratemaking authority as a substitute for its penalty powers.... This simply is not so. The PSC can indeed use its ratemaking authority to compel or punish the conduct of regulated utilities by outlining the rate-making consequences of certain acts or omissions. See, e.g., Midland Cogeneration Venture Limited Partnership v. Public Service Comm., 199 Mich.App. 286, 324-326, 501 N.W.2d 573 (1993) (Taylor, J., dissenting in part) (PSC may control a utility's transactions with its corporate affiliates and compel disclosure of corporate affiliate information indirectly through use of the PSC's rate-making authority). This is essentially what the PSC has done here by adopting the 55% discount rate for offices that fail to switch the intra-LATA dialing parity according to the PSC's conversion schedule. Basically, the PSC is simply outlining the potential rate-making consequences of failing to comply with the PSC's dialing parity conversion schedule.
As noted above, Ameritech failed to seek leave to appeal from this decision, which dealt with its challenges to the 1994 and 1995 orders. Accordingly, the decision is final and binding with respect to those orders, and, thus, would be final regarding the period from the imposition of the fifty-five percent discount until the effective date of § 312b, which relieved Ameritech of its duty to comply with those orders, and, likewise, temporarily removed from the PSC its ability to require compliance with the conversion schedule that formed the basis for its evaluation of the service deficiency meriting the fifty-five percent discount.
A close review of the interaction of the 1994 and 1995 orders and § 312b reveals, however, that at no time before the effective date of § 312b did the fifty-five percent discount take effect. The 1995 order of the PSC required dialing parity to be in place, and the fifty-five percent discount to apply to those offices where it was not, by January 1, 1996. Section 312b became effective November 30, 1995. Thus, at no time from the entry of the 1995 order requiring the fifty-five percent discount to the effective date of § 312b did the discount come into effect.

D
As to those access charges occurring following the repeal of § 312b (July 1, 1997) and continuing onward through the 1996 order, at the time the PSC issued the 1996 orders, § 312b continued to operate to deprive the PSC of the ability to implement an intraLATA dialing parity schedule of its own choosing. The PSC's ability to determine the deficiency of access services that did not include a component (intraLATA dialing parity), which the PSC itself was then powerless to require the inclusion of, likewise would seem to be in peril given the existence of § 312b. As noted in part II, at the time the PSC issued the 1996 orders, they were unlawful in the face of § 312b in so far as they purported to require intraLATA dialing *183 parity implementation. Given that the PSC lacked jurisdiction to require intraLATA parity at this time, the obvious corollary is that it likewise lacked jurisdiction to find service that lacked dialing parity deficient. Accordingly, we reverse the PSC's 1996 orders in so far as it purports to require implementation of dialing parity on a schedule different than the one the Legislature enacted in § 312b, and also to the extent that it purports to discount as deficient service that complied with the Legislature's requirements in § 312b.
This does not, however, conclude our review of the applicability of the fifty-five percent discount to those access charges that accrued following the repeal of § 312b. As noted in part II, § 312b(4) specifically included a saving clause preserving prior PSC orders, except to the extent otherwise provided in § 312b. Once § 312b was repealed, the effect was to return to the PSC authority over dialing parity issues and to allow it to enforce both its dialing parity schedule and prior orders, which until July 1, 1997, had been temporarily stayed, but not voided, by § 312b.
Accordingly, while the PSC was without authority to issue its 1996 orders, and thus could not rely on them following July 1, 1997, the prior 1995 order providing for the fifty-five percent discount remained valid and applicable to those dates following the Legislature's repeal of its intraLATA regulation (§ 312b). Given that this order has already been affirmed by the Court of Appeals, it has already been determined that it represents a lawful and reasonable rate-making function of the PSC, and thus is valid. Under our broad view of res judicata[7], this alone should likely conclude our discussion.
Given, however, the unusual nature of this case, where the PSC has issued multiple and repetitive orders in the face of changing legislation and significant concurrent appellate activity, reliance solely on res judicata alone in affirming the applicability of the 1995 order, while technically proper, might lead to some confusion.[8] Accordingly, while we find the analysis of the appropriateness of the fifty-five percent discount undertaken by the Court of Appeals to be persuasive, and adopt such reasoning ourselves, we find even more persuasive the fact the Ameritech did not challenge that order on appeal and further that, while Ameritech labors before the Court to challenge the 1996 orders, its challenge to the 1995 order is based solely on the premise that the 1995 MTA amendments voided the orders, a theory we have rejected. We thus hold that the 1995 order of the PSC requiring a fifty-five percent discount on access charges for those exchanges where intraLATA parity is not provided remains applicable, beginning with the repeal of § 312b and continuing on until further order of the PSC.

IV
The Court of Appeals found that neither §§ 312a and 312b nor the PSC's *184 1994 and 1995 orders were preempted by § 271 of the FTA. Thus, the Court of Appeals rejected the arguments of Ameritech[9], which appears as appellee before this Court. While certain appellants have raised questions regarding preemption under § 271 of the FTA, the arguments advocated herein are those accepted by the Court of Appeals. Appellee Ameritech has neither applied for leave to cross appeal on this issue, nor offered this argument as an alternative rationale to support the favorable ruling it received below.[10] Accordingly, this issue, itself, is not properly before the Court.[11] Since it is not suggested that the findings of the Court of Appeals are erroneous on this issue, we accept that Court's determination that the FTA does not preempt the sections of the MTA and the PSC orders in question. Nonetheless, we are forced to briefly review certain aspects of this issue as a basis necessary for embarking on an analysis of the claim of mootness offered by Ameritech.
The Court of Appeals correctly outlined the scope of § 271 of the FTA as follows:
Under § 271(a), a Bell operating company may provide interLATA service only as provided in § 271. Under § 271(f), post-February 8, 1996, federal court orders entered pursuant to the AT & T consent decree that remove interLATA restrictions imposed on the Bell operating companies are superseded by § 271(a). Under § 271(e)(2)(A), a Bell operating company granted the authority to provide interLATA service under § 271 shall also provide intraLATA toll dialing parity. Finally, under the general rule stated in § 271(e)(2)(B), a state may not require a Bell operating company to implement intraLATA toll dialing parity before the earlier of the time when the Bell operating company is granted the authority under § 271 of the FTA to provide interLATA service or February 8, 1999. However, in order to avoid the preemptive effect of this general rule, § 271(e)(2)(B) also provides a grandfather clause containing two exceptions whereby a state can order a Bell operating company to implement intraLATA dialing parity before the times otherwise specified in the general rule: "Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity...." See, generally, 47 USC 271(a), (e)(2)(A) and (B), and (f); see also Bell Atlantic-New Jersey, supra, 141 Cong. Rec., S. 8348-8349 (daily ed., June 14, 1995). [229 Mich. App. at 694-695, 583 N.W.2d 458.]
Following this review, and relying on Bell Atlantic-New Jersey, the Court of Appeals determined that "§ 312a and § 312b constitute state orders for the purpose of the grandfather clause." 229 Mich.App. at 697, 583 N.W.2d 458. Furthermore, the Court concluded that the "PSC's 1994 and March 1995 orders also constitute state orders within the grandfather clause," again relying on Bell Atlantic-New Jersey. 229 Mich.App. at 699, 583 N.W.2d 458. Because neither of these conclusions are challenged on appeal, we accept them as correct.[12]
Despite these findings, the Court of Appeals proceeded to hold that, "[b]ecause we *185 have determined that the PSC's previously ordered implementation schedule was rendered void because it conflicted with § 312b, repealed effective July 1, 1997, and § 312a, we conclude that the PSC's 1996 implementation compliance orders were unlawful or unreasonable." 229 Mich.App. at 701, 583 N.W.2d 458. As noted above, however, this latter reasoning, regarding the purported conflict between § 312b and the prior PSC orders, was in error. Thus, while the Court of Appeals ruled that both the statute and the orders were sufficient to bring Michigan within the confines of the grandfather clause, and we accept that unchallenged ruling as correct, we are unable to proceed to the conclusion reached by that Court where the remainder of its reasoning was in error.

V

A
All of this[13] brings us to appellee Ameritech's contention that the instant matters have become moot in light of the recent United States Supreme Court decision AT & T Corp. v. Iowa Utilities Bd., 525 U.S. ___, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999),[14] and various Federal Communications Commission orders.[15] A central holding of AT & T Corp. regards the Supreme Court's determination that the FCC had authority to issue certain rules regarding intraLATA toll dialing parity.
In essence, Ameritech's argument appears to require a chain of reasoning that would require acceptance of the argument offered below regarding federal preemption.[16] As viewed by Ameritech, § 312b nullified the PSC's 1994 and 1995 orders. Accordingly, argued Ameritech, at the determinative time for the grandfather clause, December 19, 1995, there was no longer a valid PSC order for full intraLATA dialing parity. The 1996 orders would, in Ameritech's view, have been new orders, and thus not grandfathered.[17] We must reject such a view, however, given *186 both our findings regarding the actual effect of § 312b and the unchallenged finding of the Court of Appeals that §§ 312a and 312b themselves were "orders" sufficient to trigger the grandfather clause and avoid federal preemption.[18]
Ameritech offers four submissions to this Court,[19] all of which center on a view that the United States Supreme Court has now ruled upholding the validity of FCC jurisdiction to issue regulations regarding intrastate toll dialing parity, and that such regulations preempt local regulation. While not challenging the holding of that Court on the matters before it, we disagree with Ameritech regarding the import of that decision on the PSC's regulation of intraLATA dialing parity. Recall the language of § 271 of the FTA:
(e) Limitations

* * *
(2) IntraLATA toll dialing parity
(A) Provision required
A Bell operating company granted authority to provide interLATA services... shall provide intraLATA toll dialing parity throughout that State coincident with its exercise of that authority.
(B) Limitation
Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity, a State may not require a Bell operating company to implement intraLATA toll dialing parity in that State before a Bell operating company has been granted authority under this section to provide interLATA services originating in that State or before 3 years after February 8, 1996, whichever is earlier. Nothing in this subparagraph precludes a State from issuing an order requiring intraLATA toll dialing parity in that State prior to either such date so long as such order does not take effect until after the earlier of either such dates. [47 U.S.C. 271(e)(2)(A)-(B).]
Section 271(e)(2)(B), by its clear and unambiguous language, does not apply to those states that had issued an order by December 19, 1995, requiring implementation of toll dialing parity. We agree with the Court of Appeals conclusion that Michigan is such a state. Thus the prohibition of § 271(e)(2)(B) does not apply to Michigan. Furthermore, the prohibition itself plainly expired three years after February 8, 1996, i.e., on February 8, 1999. Thus the preemptive rule of § 271(e)(2)(B) is no longer in place with regard to any state.

B
An alternative argument was presented by counsel for appellee during the course of oral argument. There, Ameritech suggested that Michigan was a grandfathered state, but only with respect to the first ten percent of customers, as required by § 312b(1)(a). We disagree. This argument is founded, once again, on the basis that § 312b, contrary to the express language of § 312b(4), voided the PSC's 1994 and 1995 orders. If one were to accept this as true, the 1994 and 1995 orders, which required full intraLATA dialing parity, would be null and void, and, thus, on the operative date of the grandfather clause, December 19, 1995, only § 312b would have been in effect.
The additional difficulty (besides its erroneous view of § 312b's effect) of *187 this argument is that, while § 312b, under the circumstances in existence on December 15, 1995, only required ten percent intraLATA parity, this is not a determinative figure. The plain language of § 271(e)(2)(B) of the FTA, as quoted above, grandfathers those states "that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity...." It does not, on its face, apply only to those states that have issued an order requiring a Bell operating company to implement full intraLATA toll dialing parity. Thus, even were we to accept the erroneous argument that § 312b voided the 1994 and 1995 orders of the PSC, so that they did not exist for purposes of the grandfather clause, we would still reject Ameritech's argument as contrary to the language of the statute. There is no provision in § 271 of the FTA that either would limit grandfathering to only those states that have ordered full dialing parity, or, alternatively, any provision that would limit grandfathering only to the extent of the orders in existence on December 19, 1995.

C
In the absence of a federal statutory bar to the PSC's jurisdiction, we turn to whether any federal regulatory action has preempted the PSC's jurisdiction. In the wake of the AT & T Corp. decision, the FCC promulgated an order on March 23, 1999, in CC Docket No. 96-98, which has been offered by Ameritech in support of its contention that dialing parity implementation is now controlled and mandated by the FCC. Paragraph one of this order states:
On January 25, 1999, the United States Supreme Court, in AT & T v. Iowa Utilities Board, reversed, in part, the rulings of the United States Court of Appeals for the Eighth Circuit that had vacated certain rules that this Commission had adopted pursuant to the Communications Act of 1934 (the Act), as amended by the Telecommunications Act of 1996 (1996 Act), and held,inter alia, that the FCC has general jurisdiction to implement the 1996 Act's local competition provisions.
We agree with this, and see no cause to dispute the findings of the Court or the commission regarding the FCC's jurisdiction.[20] We find telling, however, paragraph six of this order, wherein the FCC makes clear that its assertion of jurisdiction does not deprive states such as Michigan that have ordered the implementation of dialing parity by an earlier deadline of jurisdiction:
We emphasize that the reinstatement of our jurisdiction over intraLATA toll dialing parity does not deprive state commissions of the authority to require LECs [local exchange carriers] to comply with an earlier deadline for the implementation of intraLATA dialing parity. We encourage state commissions to do so where they deem appropriate, particularly where a plan is close to approval.
Thus, we can conclude that the FCC possessed no intent to deprive the PSC of the authority to require intraLATA dialing parity by a deadline before any federally mandated deadline. The various PSC orders of 1994 and 1995 evidence both an intent to mandate a deadline before any federally required one for the implementation of dialing parity and contain sufficient requirements to make clear the required implementation plan.
After all this, the PSC approved a final implementation plan requiring Ameritech to implement dialing parity by May *188 12, 1999, in all exchanges. (PSC order of April 12, 1999, Case No. U-11104.) Thus, the PSC has, once again, issued an order requiring dialing parity. Given the erroneous findings of the Court of Appeals, the PSC was faced with a ruling that its prior orders were unlawful or unreasonable and, thus, invalid. Subsequently, Ameritech, in apparent response to the FCC's assertion of jurisdiction, elected to file an implementation plan with the PSC that was, following objections by certain of the appellants in this matter, accepted by the PSC in its April 12, 1999, order.[21]
Included within Ameritech's Third Supplemental Suggestion of Mootness is an affidavit from Ameritech's Director of Implementation, reciting inter alia:
10. Pursuant to Ameritech Michigan's Amended Plan, Ameritech Michigan has implemented intraLATA toll dialing parity in the remaining 30% of its access lines not later than May 12, 1999.
11. Ameritech Michigan has now implemented intraLATA toll dialing parity in its entire service area. [Affidavit of John R. Mazor, Exhibit 5 to Ameritech's Third Supplemental Suggestion of Mootness.]
Thus, it appears that appellee Ameritech has indeed complied with its own implementation plan and the PSC's order, and that intraLATA dialing parity has finally come to exist in Michigan before the issuance of today's opinion.[22] Accordingly, while several aspects of this case have apparently moved toward a final resolution, in order to determine the appropriateness of the fifty-five percent discount and the extent of its applicability, we have been forced to review the questions before us regarding the effect of § 312a and § 312b and the validity of the various PSC orders.
The assistant Attorney General appearing on behalf of the PSC advised this Court at oral argument that a bill was submitted by Ameritech to appellant AT & T, following the Court of Appeals decision that struck down the fifty-five percent discount, for $11 million, representing the difference in access charges with the discount removed. In its multitude of post-oral argument submissions, Ameritech has not disputed that it issued this bill and similar bills to other interexchange carriers.
While we have not been presented with complete documentation of all the pertinent figures, it is quite clear that our ruling herein will have a substantial effect on the access charges made by Ameritech to interexchange carriers. It has not been alleged that AT & T or other appellees have paid these bills resulting from the Court of Appeals disputed holding regarding the fifty-five percent discount, and, accordingly, this question would not appear moot under Ideal Furnace Co. v. Int'l Molders' Union of North America, 204 Mich. 311, 169 N.W. 946 (1918), and its progeny. Where "[w]e are convinced that upon this record the questions are purely academic; that no real and substantial controversy is before us; that the order of the court below having been satisfied and the fine paid no relief can be now granted appellant." Id. at 312, 169 N.W. 946. A determination of the appropriateness of the discount cannot be made without reaching the questions that underlie the PSC's authority in this matter. Thus, this cause is not moot, there having been questions remaining before us that we were required to resolve, and such questions not having been academic, but in fact determinative of significant amounts in controversy.

*189 VI
The Court of Appeals also reversed the Ingham Circuit Court's order issuing a writ of mandamus. The Court based this decision on its determination that "Ameritech was not, and is not, required to comply with the PSC's unlawful or unreasonable 1996 orders...." 229 Mich.App. at 702, 583 N.W.2d 458. As we have concluded above, the Court of Appeals reasoning behind this determination was largely in error. Nonetheless, we agree with that Court's conclusion in this regard.
A writ of mandamus will only be issued if the plaintiffs prove they have a "clear legal right to performance of the specific duty sought to be compelled" and that the defendant has a "clear legal duty to perform such act...." Toan v. McGinn, 271 Mich. 28, 34, 260 N.W. 108 (1935). We review a trial court's decision regarding a writ of mandamus for abuse of discretion. Spalding v. Spalding, 355 Mich. 382, 94 N.W.2d 810 (1959). Where a central issue in the appeal involves statutory interpretation, which is a question of law, that is reviewed de novo. Cardinal Mooney High School, supra; Smeets v. Genesee Co. Clerk, 193 Mich.App. 628, 633, 484 N.W.2d 770 (1992).
Here, the Ingham Circuit Court granted the writ of mandamus, ordering Ameritech to comply with the 1996 orders. At the time this order was issued, the PSC's 1996 orders had been entered, but, nonetheless, Ameritech had not complied with them. At the time the circuit court issued this order, November 20, 1996, § 312b had not yet been repealed. Accordingly, the Legislature had relieved Ameritech of its duty to comply with the 1996 orders, and, thus, entry of the writ was erroneous, Ameritech having no legal duty to comply with the unlawful 1996 orders of the PSC. Toan, supra. Accordingly, we affirm, but on very different grounds, the Court of Appeals reversal of the issuance of the writ of mandamus.[23]

VII
Accordingly, we hold that, excepting the time during which § 312b, before its repeal, operated to relieve Ameritech from compliance with the PSC's orders, the PSC properly had jurisdiction to order Ameritech to implement intraLATA dialing parity. We further hold that, pursuant to its lawful ratemaking authority, the PSC, in its 1995 order, properly enacted a fifty-five percent discount for access charges to interexchange carriers where intraLATA parity was not provided, applicable to that period when the PSC was able to require the implementation of intraLATA dialing parity, and thus find deficient any service that was hampered by its absence, that being the period beginning July 1, 1997 (the date of repeal of § 312b) and continuing until appellee complied with the applicable orders of the PSC. In view of the factual nature necessarily present in such inquires, we remand this dispute to the PSC, solely for the purposes of determining the calculation of what monies might be due to which parties by operation of our holding regarding the fiftyfive percent discount. We reverse the writ of mandamus, it being ill-grounded at the time it was issued, and find this cause to be in no way moot, given the substantial amount of access charges in controversy, the amounts of which are necessarily determined by this decision. No costs are taxed,[24] this being a public question.[25]
*190 WEAVER, C.J., and BRICKLEY, MARILYN J. KELLY, TAYLOR, and CORRIGAN, JJ., concur MICHAEL F. CAVANAGH, J.
YOUNG, J., not participating.
NOTES
[1] 229 Mich.App. 664, 668-680, 583 N.W.2d 458 (1998).
[2] 459 Mich. 878, 586 N.W.2d 744 (1998).
[3] The Court of Appeals placed considerable reliance on the legislative history of these sections. Our review of this history, however, leads us to a conclusion that, in general, various portions of them could be offered in support of both the appellants' and appellee's arguments. With the exception of those instances cited above, where the legislative record reveals the Legislature considered and rejected various alternative provisions, we do not find the legislative history offered by either party, when considered in the whole and viewed along with the other historical materials available, to gravitate in either direction. Accordingly, other than where specifically noted above, we elect to rely on the language of the statute, rather than its history, in reaching our conclusions.
[4] We acknowledge that our past case law has not been entirely consistent regarding the subject of the amount of deference to be given when an administrative agency with expertise in its field construes a statute governing the area regulated by the agency. The unique facts of this case, involving a protracted period of litigation, during which statutes were both enacted and repealed, makes this case poorly suited to resolve such inconsistencies. Accordingly, we express no view on such matters, leaving their resolution for another day.
[5] In response to appellee's suggestions of mootness, appellants advise us that access charge bills relating to charges arguably affected by this discount remain subjects of dispute between the parties, and the amounts in controversy are suggested to be not insubstantial.
[6] Ameritech Michigan v. Public Service Comm., entered February 7, 1997 (Docket No. 184718). See n. 19.
[7] "The doctrine of res judicata was judicially created in order to `relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.' " Hackley v. Hackley, 426 Mich. 582, 584, 395 N.W.2d 906 (1986), quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). As we have stated:

In Michigan, the doctrine of res judicata applies, except in special cases, in a subsequent action between the same parties and "`not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'" [Hackley at 585, 395 N.W.2d 906 (citations omitted).]
[8] It should be pointed out that today we have dealt with the applicability of the 1995 order to various dates, but the validity of that order itself has already been upheld by the prior Court of Appeals panel, with review of such decision not being sought by Ameritech in this Court.
[9] See 229 Mich.App. at 682, 583 N.W.2d 458.
[10] Ameritech has, however, asserted federal preemption as a basis for finding this action to be moot. This argument will be addressed below.
[11] As an appellee, should review of an adverse decision below be sought, an application for leave to appeal as cross-appellant may be filed. Alternatively, "[i]t is well established that an appellee who has taken no cross appeal may still urge in support of the judgment in its favor reasons that were rejected by the lower court." Middlebrooks v. Wayne Co., 446 Mich. 151, 166, n. 41, 521 N.W.2d 774 (1994).
[12] We note in passing that the legislative history regarding the grandfather clause reveals that this provision came into being by way of an amendment (the Breaux-Leahy amendment) offered in apparent response to a letter from the governors of nine states who had some sort of intraLATA requirements and urging against preemption of those state requirements that already existed. Our state's Governor, John Engler, was among the signatories to that letter. The grandfather clause amendment was offered three weeks later. See, generally, Cong. Rec., S. 8349 (daily ed., June 14, 1995). Likewise, the court in Bell Atlantic-New Jersey noted that Michigan was one of the grandfathered states. Id. at 615.
[13] As a rule, this Court will, on its own motion, decline to consider cases that it does not have the power to determine, including those that are moot. Ideal Furnace Co. v. Int'l Molders' Union of North America, 204 Mich. 311, 169 N.W. 946 (1918). We do so as a preliminary matter, before addressing the merits of the case itself. While we have made a determination that mootness is not present here, or we would not have addressed the substantive issues, the complexity of the case requires an understanding of both the factual background and legal issues. Thus we take the somewhat unusual step of placing our consideration of mootness toward the end of our opinion. We caution, however, that it remains a preliminary determination, and our placement of the discussion in this sequence is merely a matter of ordering for the sake of convenience and comprehension.
[14] Before oral argument, Ameritech filed a motion to hold this matter in abeyance, pending the results it expected to follow from this decision. This Court denied that motion.
[15] Given the recent vintage of the United States Supreme Court decision in AT & T Corp., appellee's somewhat belated presentation of this question is understandable. On those occasions where newly issued decisions might arguably affect a question before the Court, the parties are free to advise the Court of their recent issuance. Our rejection of appellee's contention that AT & T Corp. should render the instant case moot is based on an analysis of the merits of such a claim, without reference to the timeliness of its arrival.
[16] While such an argument appears to form the logical basis of appellant's argument on this issue, appellant, before this Court, does not detail the argument as it did below, but rather proceeds onward.
[17] While the Court of Appeals, as noted above, did not accept the federal preemption argument as offered by Ameritech, the practical effect of the result reached by that Court was similar in effect to the result that would follow from a finding of federal preemption. This anomaly, combined with the events briefly summarized below, appears to have been largely responsible for the multiple supplemental (and post-oral argument) pleadings we have received arguing the question of mootness.
[18] Even if we were offered a challenge to this finding of the Court of Appeals, we would note that we find the reasoning of Bell Atlantic-New Jersey to be instructive, and, in view of the record indicating the grandfather clause came to be in part due to the efforts of Michigan officials to avoid preemption, we would find that Michigan is encompassed by the grandfather clause, given the existence of the 1994 and 1995 PSC orders.
[19] The submissions are entitled "Suggestion of Mootness," Supplemental Suggestion of Mootness," "Second Supplemental Suggestion of Mootness," and "Third Supplemental Suggestion of Mootness."
[20] Given the unusual manner in which this question came to the Court, it would hardly be surprising if developments occurred that might reveal open questions about the interaction of federal and state regulatory bodies. Our holding today should not be construed as a definitive answer to such questions. Nonetheless, we possess sufficient information to make the determination that the case before us is not mooted by these subsequent developments.
[21] The commission specifically noted in its order that "[i]n granting this approval, the Commission does not adopt Ameritech Michigan's position that only federal law governs this matter."
[22] In the event that this were not the case, however, the PSC's valid order concerning the fifty-five percent discount would continue to apply to access charges made by Ameritech to interexchange carriers in those areas without intraLATA dialing parity.
[23] We note that Ameritech failed to seek a stay of the mandamus order from the Court of Appeals, although it did seek such a stay regarding the PSC's 1996 orders themselves. While we do not condone Ameritech's failure to comply with the mandamus order without seeking relief from an appellate tribunal, where the writ itself was erroneously entered, we are forced to uphold its eventual reversal.
[24] Given that the Court of Appeals based its authorization of taxation of costs upon Ameritech being the prevailing party, and in view of our holding today, which, in large part, reverses the determinations below, the Court's authorization of the taxation of costs is also reversed.
[25] By separate order today, we lift the stay issued by the Court of Appeals in a separate case, Court of Appeals Docket No. 217037, Supreme Court Docket No. 114078, relieving Ameritech from compliance with an order of the PSC dated January 19, 1999, which again required the implementation by Ameritech of intraLATA dialing parity. That order was entered after a complaint for intraLATA relief was filed by appellant MCI following the issuance of the Court of Appeals decision in the matter before us, and the repeal of § 312b. By separate order, we are remanding that matter to the Court of Appeals for reconsideration in light of our decision today, as well as, without limitation, reconsideration in light of subsequent events, including Ameritech's claim of mootness herein, and the events underlying that assertion.