McCormack, J.
(dissenting). The majority holds that, in a dual-employment context, the Worker’s Disability Compensation Act (WDCA)[1] mandates an employer’s coordination of benefits, such that the Second Injury Fund[2] is required to reimburse an employer only for a pro rata share of the coordinated amount of weekly benefits. As a consequence, the majority prohibits employers and employees from freely entering into employment contracts under terms as they see fit. While I agree with the majority that this Court’s role is to apply the terms of an unambiguous statute to the facts of a particular case, here the applicable sections of the WDCA defy an unambiguous reading. In fact, the relevant statutory provisions at issue do not even refer to one another, much less unambiguously require the majority’s interpretation. Because I am generally reluctant to interpret ambiguous statutory terms to impede freedom of contract, and moreover because the majority’s reading anomalously applies only to the minority of employers who hire part-time workers, while still *152 allowing the great majority of employers to enter into the employment contracts they deem appropriate, I respectfully dissent.
I. BACKGROUND
When an employee working two jobs is eligible for WDCA wage-loss benefits, the employer in whose service the employee worked at the time of the injury (the injury employer) is responsible for paying the full amount of those benefits.[3] When the injury employer provided 80 percent or less of the injured employee’s average weekly wage, however, the injury employer is ultimately responsible only for that portion of the wage-loss benefits that corresponds to the portion of the employee’s average weekly wage that the injury employer provided.[4]
In this case, because Thornapple Township provided only 10.87 percent of Robert Smitter’s average weekly wage, Thornapple was ultimately responsible for 10.87 percent of his wage-loss benefits: after paying the full amount of the workers’ compensation wage-loss benefits up front, Thornapple claimed entitlement to reimbursement from the Second Injury Fund for 89.13 percent of the amount paid. Had Thornapple paid no other benefits to Smitter, there is no question, and there would have been no dispute, that Thornapple was entitled to recover from the Second Injury Fund 89.13 percent of the wage-loss benefits it paid Smitter. Case closed.
As it happens, however, Thornapple offered Smitter both workers’ compensation wage-loss benefits and *153 sickness and accident benefits, which he accepted.[5] Wage-loss benefits, of course, compensate an employee for wages lost as a result of an injury. Sickness and accident benefits, in contrast, cover out-of-pocket expenses associated with lifestyle changes necessitated by an injury.[6] The WDCA allows an injury employer to “coordinate” benefits when that employer also provides alternative benefits, such that an injury employer’s initial obligation to pay workers’ compensation wage-loss benefits can be reduced by the amount of other benefits the injury employer provides.[7] The statute explicitly states that disability benefits, such as those provided by Thornapple to its part-time firefighters, are among the benefits that can be coordinated.[8] The crucial question is whether they must be.
*154 II. PLAIN LANGUAGE OP THE WDCA
The majority holds that MCL 418.354(1) mandates that employers coordinate benefits. I am not convinced. In relevant part, § 354(1) states that “the employer’s obligation to pay or cause to be paid weekly benefits other than specific loss benefits under [MCL 418.361(2) and (3)] shall be reduced by these amounts!.] ”[9] I agree with the majority that the sickness and accident policy Thornapple provided to Smitter is covered by § 354(1). The question is whether Thornapple was required to coordinate that coverage with the wage-loss benefits it also paid, or whether it could elect to do so. The majority believes that the Legislature’s use of the word “shall” is dispositive.
I agree with the majority that “shall” generally implies a mandatory directive. But context can occasionally undercut the general principle that the ordinary usage applies.[10] In this case, the majority’s conclusion is undercut by the text of the WDCA for three reasons.
First, MCL 418.354(1) specifically states that an employer’s obligation may be reduced by coordination, not the Second Injury Fund’s obligation or the employee’s bottom-line benefits. This plain language must mean that the decision to coordinate rests with the employer and that the Second Injury Fund’s liability is not implicated. If the Legislature intended mandatory benefit coordination it could have more clearly *155 accomplished that in any number of ways. Most simply, it could have omitted the phrase “the employer’s obligation to pay or cause to be paid” from the final sentence of MCL 418.354(1). The sentence would then read: “Except as otherwise provided in this section, . . . weekly benefits other than specific loss benefits under [MCL 418.361(2) and (3)] shall be reduced by these amounts!.]”[11] This language would better support the majority’s reading because it would be obvious that the Legislature’s intent was to ensure that the employee’s wage-loss benefits were reduced when the employee also received additional benefits.
Second, MCL 418.372(1)(b) unambiguously sets forth the formula by which the Second Injury Fund’s liability is determined. In that subsection, which provides that the Second Injury Fund “is separately but dependently liable for the remainder of the weekly benefits,” and “shall reimburse the insurer or self-insurer quarterly for the second injury fluid’s portion of the benefits due the employee or the employee’s dependents,” no reference is made to the possibility of benefit coordination or to MCL 418.354 more specifically.[12] There is no language whatsoever to suggest that the phrase “due the employee” in MCL 418.372(1)(b) should be read to incorporate the ability or obligation to coordinate in MCL 418.354. The converse is also true; while the Legislature refers explicitly to the “second injury fund” and its liabilities in the text of MCL 418.372(1)(b), the absence of any reference to the Second Injury Fund in MCL 418.354 is meaningful. The Legislature could have connected the two sections, but chose not to do so.[13]
*156 Third, the majority argues that MCL 418.354(15), the subsection governing volunteer firefighters, supports its position that benefits coordination is mandatory. The statute states that for volunteer firefighters:
[T]he reduction of weekly benefits provided for disability insurance payments under subsection (1)(b)... may be waived by the employer. An employer that is not a self-insurer may make the waiver provided for under this subsection only at the time a worker’s compensation insurance policy is entered into or renewed.[14]
As does MCL 418.354(1), this provision refers explicitly to the employer and decisions made by the employer, not the liability of the Second Injury Fund or the employee’s bottom-line benefits. The majority believes that MCL 418.354(15) delineates the only exception to mandatory coordination. But this reading neglects the great majority of cases in which there is no second employer, as well as those in which the injury employer provides more than 80 percent of the injured employee’s average weekly wage. Nothing will prevent those employers from choosing to provide uncoordinated benefits to their injured employees, even if the injured employees are not volunteer firefighters or other first responders. Instead, those employers are free to contract as they see fit with respect to benefits in accordance with their employment needs.
This point warrants emphasis: under the majority’s analysis MCL 418.354(15) is implicated only in a dual-employment context in which the injury employer pro *157 vides 80 percent or less of the injured employee’s average weekly wage and can, therefore, request reimbursement from the Second Injury Fund. But MCL 418.354 on its face plainly applies to all cases, not just those in which the Second Injury Fund is dependently liable. If an employer may only waive benefit coordination under the volunteer firefighter provision of MCL 418.354(15), what import would MCL 418.354 have if Thornapple had been Smitter’s only employer, or if General Motors had been the injury employer? In either case, the injury employer surely could have chosen to pay its employees whatever benefits it deemed appropriate without regard to MCL 418.354(1) or (15).
To read MCL 418.354(1) as imposing a requirement on a subset of injury employers in dual-employment cases renders that supposedly mandatory language meaningless in a majority of situations.[15] The majority’s analysis requires us to assume away the textual clues that undercut application of the common understanding of the verb “shall” and to overlook the fact that, under the majority’s interpretation, the language of MCL 418.354(1) is inapplicable to most cases. The plain language of the WDCA does not make that analysis easy. If the touchstone of our analysis remains the plain language of the statute, I would refrain from reading such particular intent into MCL 418.354(1) and (15) because there is no clear indication that this is what the Legislature intended.[16]
*158 III. THE PUBLIC POLICY ARTICULATED BY THE LEGISLATURE
The majority’s view that the statute requires coordination of benefits by injury employers who provide less than 80 percent of an employee’s wage in dual-employment contexts (the minority injury employer) is undermined by the many contexts in which that rule is not enforceable. As previously noted, single employers and injury employers who are responsible for more than 80 percent of an employee’s weekly wage will never seek reimbursement from the Second Injury Fund and are thus free to contract with their employees to provide insurance as they deem appropriate. In addition, the non-injury employer in a dual-employment situation may provide the injured employee with an insurance benefit without triggering any obligation to coordinate before seeking reimbursement from the Second Injury Fund because the statute only addresses the coordination of benefits provided by the “same employer.”[17] It is hard to imagine that the Legislature intended to prevent benefits beyond wage-loss benefits in those cases where there is a minority injury employer in a dual-employment situation. It makes far more sense that the Legislature intended to give an employer providing both wage-loss and accident benefits the possibility of reducing its wage-loss obligation, if that employer deemed it appropriate.
To reiterate, MCL 418.354(1)(b) only directs the “same employer” to coordinate benefits. The fact that coordination is not required when an injured employee receives an additional benefit from a different employer is evidence that that the Legislature did not intend this *159 section to limit the amount of benefits an employee received,[18] If Smitter had received accident insurance from General Motors, there would have been no dispute that Thornapple would have been responsible for paying full wage-loss benefits and also been entitled to a full reimbursement by the Second Injury Fund. This limitation of the coordination provision to the benefits provided by the injury employer is yet further evidence that coordination is not mandated before reimbursement is sought. The Legislature’s decision not to require coordination of benefits among employers implies that the Legislature did anticipate that some employees would recover benefits apart from the weekly wage-loss benefits and did not see any need to address that issue.
Furthermore, permitting a minority injury employer to coordinate instead of mandating coordination does not result in greater costs being passed on to the Second Injury Fund. Any minority injury employer in a dual-employment situation that might request reimbursement from the Second Injury Fund has these choices: (1) the employer could choose not to offer additional insurance benefits at all, (2) the employer could choose to offer additional benefits, and then coordinate those benefits so that it would have a lower wage-loss liability, or (3) the employer could choose to offer additional benefits and elect not to coordinate those benefits, paying the full wage-loss benefit in addition to the additional benefit. Notably, the minority injury employer’s and the Second Injury Fund’s liabilities are the same in the first and last scenarios, and both are lower in the second. The minority injury employer does not stand to gain financially from the Second Injury Fund under any option.
*160 According to the majority, a minority injury employer loses the right to full reimbursement by providing an additional insurance benefit. If the majority is correct, the Legislature must have intended to discourage employers who are hiring part-time employees from providing incentives for those employees. Surely that narrow policy goal could have been accomplished without requiring the tenuous reading of the statutory language the majority proposes. But more fundamentally, there is no reason to suppose the Legislature sought to interfere with the prerogative of this subset of employers to enter into employment contracts and offer their employees whatever insurance benefits the employer and employee jointly elected. Respecting employment contracts seems especially important for employers trying to attract first responders in tough economic times. In the absence of any reason to worry that either the injury employer or the employee would be taken advantage of in their free market transaction, or that both would collude to take advantage of the Second Injury Fund— and such worries seem hard to imagine here — we should presume, barring legislative indication to the contrary, that the Legislature did not seek to regulate employment contract terms.
IV CONCLUSION
In my view, the more natural reading of the statutory provisions at issue is one that holds that the decision to coordinate benefits rests solely with the injury employer and does not affect the reimbursement an injury employer may request from the Second Injury Fund in dual-employment cases. This understanding gives meaning to the statutory language limiting coordination to benefits paid by a single employer, avoids reading out the phrase “the employer’s obligation” in MCL *161 418.354(1), avoids rendering the supposed mandate of the verb “shall” nugatory in a majority of employment situations, and would not punish or impede an employer seeking to recruit employees with employment terms that employers and employees deem desirable, especially for dangerous but important jobs like fighting fires.
Accordingly, I would affirm the decision of the Court of Appeals.
Viviano, J., took no part in the decision of this case.

 MCL 418.101 et seq.

 See MCL 418.501(1).

 MCL 418.351(1).

 MCL 418.372(1)(b).

 Smitter received $800 a week in sickness and accident benefits pursuant to the policy purchased by Thornapple. The benefit policy covered part-time firefighters. Thornapple Township hoped to incentivize this job to better recruit qualified candidates and therefore offered its employees disability benefits along with workers’ compensation wage-loss benefits.

 Sickness and accident benefits are essentially disability benefits, and the parties do not dispute that these benefits are provided under a disability insurance policy as described in MCL 418.354(1)(b). MCL 500.3400(1) defines “policy of disability insurance” to “included any policy or contract of insurance against loss resulting from sickness or from bodily injury or death by accident, or both, including also the granting of specific hospital benefits and medical, surgical and sick-care benefits to any person, family or group . . . .” Depending on how the relevant insurance policy defines them, disability benefits may be used for in-home assistance, special transportation needs, uncompensated medical needs, or other consequences of an injury apart from lost income. Disability benefits are especially relevant in dangerous occupations like firefighting, in which employment risks are not limited to the lost wages, and the injured are likely to require compensation greater than that provided by wage replacement. More generally, there is a robust market for disability insurance.

 MCL 418.354(1).

 MCL 418.354(1)(b).

 MCL 418.354(1).

 “Though ‘shall’ generally means ‘must,’ legal writers sometimes use, or misuse, ‘shall’ to mean ‘should,’ ‘will,’ or even ‘may.’ See D. Mellinkoff, Mellinkoff s Dictionary of American Legal Usage 402-403 (1992) (‘shall’ and ‘may’ are ‘frequently treated as synonyms’ and their meaning depends on context); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) (‘[Cjourts in virtually every English-speaking jurisdiction have held — by necessity — that shall means may in some contexts, and vice versa.’)” Gutierrez de Martinez v Lamagno, 515 US 417, 432-433 n 9; 115 S Ct 2227; 132 L Ed 2d 375 (1995).

 See MCL 418.354(1).

 MCL 418.372(1)(b).

 The majority argues that the Legislature’s use of the word “obligation,” as opposed to “liability,” in MCL 418.354(1) is a meaningful *156 reference to the third sentence of MCL 418.372(1) (b), which states that “[t]he insurer... has the obligation to pay the employee ... at the full rate of compensation.” Again, I believe that if the Legislature had intended for the two sections to he read together, it would have indicated that explicitly instead of using such cryptic means.

 MCL 418.354(15).

 “It is a maxim of statutory construction that every word of a statute should be read in such a way as to be given meaning, and a court should avoid a construction that would render any part of the statute surplusage or nugatory.” In re MCI Telecom Complaint, 460 Mich 396,414; 596 NW2d 164 (1999). It seems irrational that the Legislature would announce a mandatory directive that would apply only in a minority of situations, and I presume that the Legislature acts thoughtfully and rationally.

 "[A] court should refrain from speculating about the Legislature’s intent beyond the words employed in the statute.” In re MCI, 460 Mich at 414-415.

 MCL 418.354(1)(b). The injury employer would still seek reimbursement if they provided 80 percent or less of the employee’s wage, but the non-injury employer’s disability benefit would never be coordinated with that amount.

 See MCL 418.354(1)(b).