*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* IMPLEMENTING SECTION 6W OF 2016 PA 341 FOR CLOVERLAND ELECTRIC COOPERATIVE.

CLOVERLAND ELECTRIC COOPERATIVE,

Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

Appellee.

FOR PUBLICATION
July 23, 2019
9:05 a.m.

No. 342552
MPSC
LC No. 00-018258

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

CAMERON, J.

Appellant, Cloverland Electric Cooperative (Cloverland), is a member-regulated electric cooperative, which generates and delivers electricity to five counties in Michigan's Upper Peninsula. In 2016, the Michigan Legislature passed Public Act 341 to ensure that alternative electric suppliers (AES)[1] demonstrate that they are able to generate enough electricity to meet their capacity obligations. If an AES cannot meet its obligations, then the electric utility, such as Cloverland, must provide the AES's customers with electric capacity, and in return, implement a State Reliability Mechanism (SRM) charge, which must be paid by the AES's customers. After a hearing was held, the Public Service Commission (the PSC or the commission) issued an opinion and order on November 30, 2017, requiring Cloverland to also implement an SRM charge on Cloverland's full-service member-customers pursuant to the newly enacted law. On

---

[1] An AES is defined as: "[A] person selling electric generation service to retail customers in this state. Alternative electric supplier does not include a person who physically delivers electricity directly to retail customers in this state. An alternative electric supplier is not a public utility." MCL 460.10g(a).

appeal, Cloverland challenges the PSC's decision to require the implementation of the SRM charge. We affirm.

## I. BACKGROUND

As explained by Cloverland's chief financial officer, Robert J. Malaski, Cloverland is a member-regulated electric cooperative that generates, distributes, and sells electric energy to its

> member-customers in the counties of Chippewa, Delta, Luce, Mackinac and Schoolcraft in Michigan's Upper Peninsula, including the cities of Sault Ste. Marie, St. Ignace, Mackinac Island and Manistique. Cloverland has approximately 42,000 member-customers, consisting of residential, farm residential, seasonal, commercial, outdoor lighting and large power accounts.

Malaski testified that "Cloverland has a single member, UP Paper, LLC, ('UP Paper') which purchases a portion of its electric energy from an AES. Cloverland also serves UP Paper for the remainder of its electric energy needs under the terms of a special contract."

This case is about the legal requirements for ensuring the reliability of the electric grid in Michigan. In order for a summary of the proceedings in this case to make sense, it is necessary to quote pertinent language from the governing statute, MCL 460.6w, which was added by 2016 PA 341 (Act 341), effective April 20, 2017, and to explain a recent opinion of this Court, *In re Reliability Plans of Electric Utilities for 2017-2021*, 325 Mich App 207; 926 NW2d 584 (2018).

"At the end of 2016, our Legislature enacted new electric utility legislation that included Act 341. That act added, among other statutory sections, MCL 460.6w." *In re Reliability Plans*, 325 Mich App at 210-211.

> By way of background, Michigan's Legislature previously enacted what was known as the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq*., as enacted by 2000 PA 141 and 2000 PA 142, to further the deregulation of the electric utility industry. That act permitted customers to buy electricity from alternative electric suppliers instead of limiting customers to purchasing electricity from incumbent utilities . . . . Among the purposes of the act, as amended by Act 341, is the promotion of "financially healthy and competitive utilities in this state." MCL 460.10(b). [*In re Reliability Plans*, 325 Mich App at 211 (quotation marks and citation omitted).]

As additional background information, it is noted that

> the Midcontinent Independent System Operator (MISO) is the regional transmission organization responsible for managing the transmission of electric power in a large geographic area that spans portions of Michigan and 14 other states. To accomplish this, MISO combines the transmission facilities of several transmission owners into a single transmission system. In addition to the transmission of electricity, MISO's functions include capacity resource planning. MISO has established ten local resource zones; most of Michigan's lower

-2-

peninsula is located in MISO's Local Resource Zone 7, while the upper peninsula is located in MISO's Local Resource Zone 2. [*Id.*]

Further, MISO "serves as a mechanism for suppliers to buy and sell electricity capacity through an auction. This allows for the exchange of capacity resources across energy providers and resource zones." *Id.* at 212.

"At the end of 2016, our Legislature enacted Act 341, in part adding MCL 460.6w, which imposes resource adequacy requirements on electric service providers in Michigan and imposes certain responsibilities on the [PSC]." *In re Reliability Plans*, 325 Mich App at 213. MCL 460.6w(2) provides, in relevant part, "If, by September 30, 2017, the Federal Energy Regulatory Commission [(FERC)] does not put into effect a resource adequacy tariff that includes a capacity forward auction[2] or a prevailing state compensation mechanism, then the commission shall establish [an SRM] under subsection (8)." It is undisputed here that the FERC did not implement a resource adequacy tariff that included a capacity forward auction or a prevailing state compensation mechanism by September 30, 2017. Thus, the PSC was required to establish an SRM under MCL 460.6w(8). See MCL 460.6w(2); *In re Reliability Plans*, 325 Mich App at 213 ("The parties agree that because the [FERC] did not put into effect the MISO-proposed tariff, the [PSC] is required by [MCL 460.6w(2)] to establish [an SRM]."). An SRM "means a plan adopted by the commission in the absence of a prevailing state compensation mechanism to ensure reliability of the electric grid in this state consistent with subsection (8)." MCL 460.6w(12)(h).

When an AES fails to demonstrate that it has sufficient capacity to meet its capacity obligations, the electric utility must provide the AES's customer with electric capacity, and in return, an SRM charge must be paid.[3] In particular, MCL 460.6w(6) provides:

> A capacity charge shall not be assessed for any portion of capacity obligations for each planning year for which an alternative electric supplier can demonstrate that it can meet its capacity obligations through owned or contractual rights to any resource that the appropriate independent system operator allows to meet the capacity obligation of the electric provider. The preceding sentence shall not be applied in any way that conflicts with a federal resource adequacy tariff, when applicable. Any electric provider that has previously demonstrated that it can meet all or a portion of its capacity obligations shall give notice to the commission by September 1 of the year 4 years before the beginning of the applicable planning year if it does not expect to meet that capacity obligation and instead expects to pay a capacity charge. The capacity charge in the utility

---

[2] " 'Capacity forward auction' means an auction-based resource adequacy construct and the associated tariffs developed by the appropriate independent system operator for at least a portion of this state for 3 years forward or more." MCL 460.6w(12)(b).

[3] The SRM charge is sometimes referred to in this case as a state reliability charge, or simply a capacity charge.

service territory must be paid for the portion of its load taking service from the alternative electric supplier not covered by capacity as set forth in this subsection during the period that any such capacity charge is effective.

MCL 460.6w(7) states:

> An electric provider shall provide capacity to meet the capacity obligation for the portion of that load taking service from an alternative electric supplier in the electric provider's service territory that is covered by the capacity charge during the period that any such capacity charge is effective. The alternative electric supplier has the obligation to provide capacity for the portion of the load for which the alternative electric supplier has demonstrated an ability to meet its capacity obligations. If an alternative electric supplier ceases to provide service for a portion or all of its load, it shall allow, at a cost no higher than the determined capacity charge, the assignment of any right to that capacity in the applicable planning year to whatever electric provider accepts that load.

MCL 460.6w(8) states, in relevant part:

> If a state reliability mechanism is required to be established under subsection (2), the commission shall do all of the following:
>
> (a) Require, by December 1 of each year, that each electric utility demonstrate to the commission, in a format determined by the commission, that for the planning year beginning 4 years after the beginning of the current planning year, the electric utility owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable.
>
> (b) Require, by the seventh business day of February each year, that each alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission, in a format determined by the commission, that for the planning year beginning 4 years after the beginning of the current planning year, the alternative electric supplier, cooperative electric utility, or municipally owned electric utility owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable. . . . By the seventh business day of February in 2018, an alternative electric supplier shall demonstrate to the commission, in a format determined by the commission, that for the planning year beginning June 1, 2018, and the subsequent 3 planning years, the alternative electric supplier owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable. If the commission finds an electric provider has failed to demonstrate it can meet a portion or all of its capacity obligation, the commission shall do all of the following:

(*i*) For alternative electric load, require the payment of a capacity charge that is determined, assessed, and applied in the same manner as under subsection (3) for that portion of the load not covered as set forth in subsections (6) and (7). If a capacity charge is required to be paid under this subdivision in the planning year beginning June 1, 2018 or any of the 3 subsequent planning years, the capacity charge is applicable for each of those planning years. . . .

In short, an SRM charge is required to be paid when an AES fails to make the required capacity demonstration.

MCL 460.6w(3) requires an SRM charge to be determined in a contested case proceeding. Further, MCL 460.6w(3) sets forth a formula for determining an SRM charge as follows:

In order to ensure that noncapacity electric generation services are not included in the capacity charge, in determining the capacity charge, the commission shall do both of the following and *ensure that the resulting capacity charge does not differ for full service load and alternative electric supplier load*:

(a) For the applicable term of the capacity charge, include the capacity-related generation costs included in the utility's base rates, surcharges, and power supply cost recovery factors, regardless of whether those costs result from utility ownership of the capacity resources or the purchase or lease of the capacity resource from a third party.

(b) For the applicable term of the capacity charge, subtract all non-capacity-related electric generation costs, including, but not limited to, costs previously set for recovery through net stranded cost recovery and securitization and the projected revenues, net of projected fuel costs, from all of the following:

(*i*) All energy market sales.

(*ii*) Off-system energy sales.

(*iii*) Ancillary services sales.

(*iv*) Energy sales under unit-specific bilateral contracts.   [Emphasis added.]

In July 2017, Cloverland filed what it called an "application" in the PSC. Cloverland argued, in relevant part:

The SRM [charge] should be designed to compensate Cloverland for the capacity obligation it undertakes to meet the retail choice customer capacity needs that are not proven to be satisfied by the serving AES. In Cloverland's case, the cost of capacity can be determined based on the costs reflected in Cloverland's wholesale power supply agreement with Wisconsin Electric Power Company ("WEPCO"),

and are intended to be revenue neutral based upon the assumption that no electric choice load will take capacity service from Cloverland.

In support of its claim, Cloverland attached the written testimony of Malaski, "which describes how Cloverland's proposed SRM charge meets the requirements of Act 341 in a reasonable and prudent manner, how a capacity charge under that mechanism should be calculated, and other related matters." Malaski testified that Cloverland was not proposing to impose an SRM charge on its members-customers, as distinguished from UP Paper, the customer of the AES.

In August 2017, the PSC Staff (the Staff) filed the written testimony of Nicholas M. Revere, who is employed by the PSC as "the Manager of the Rates and Tariff Section of the Regulated Energy Division." Revere stated that Cloverland's proposal to use the WEPCO capacity charges as a proxy did not satisfy "the requirements of the law, as it does not include all capacity-related costs included in [Cloverland's] rates." The Staff had gone "through the costs in the Cost of Service Study (COSS) and identified those that are capacity-related." Revere stated that the Staff disagreed with Cloverland's proposal to not require its members-customers, also sometimes referred to as full-service customers or bundled customers, to pay the SRM charge; that is, the Staff did not approve Cloverland's suggestion to limit the SRM charge to customers of an AES, which customers are also sometimes referred to as Retail Open Access (ROA) customers.

After entertaining the parties' arguments through briefing, the PSC issued a 50-page opinion and order providing, in relevant part, that Cloverland "shall implement a state reliability mechanism capacity charge of $228,891 per megawatt-year, or $627 per megawatt-day, for full-service customers, using the Commission Staff's rate design[.]" Also, if an AES "fails to make a satisfactory demonstration regarding its forward capacity obligations pursuant to MCL 460.6w(8), the resulting state reliability mechanism capacity charge shall be levied by Cloverland . . . on the retail open access customers of that [AES] on a pro rata basis."

After filing an appeal in this Court, Cloverland filed in the PSC a motion for a stay of enforcement of the portion of the PSC's November 2017 opinion and order. The Staff filed a response to Cloverland's motion for a stay and agreed to a limited stay to avoid the unintended consequences of application of the November 2017 opinion and order. The Staff acknowledged that Cloverland's COSS was out of date and did not reflect the actual cost to serve current customers. Thus, the Staff did not dispute that implementation of the November 2017 opinion and order would cause some customers to be charged for capacity on the basis of outdated information. In the Staff's view, the stay should expire when the PSC issues an order in Cloverland's pending annual SRM update case, PSC Case No. U-20144. Also, the stay should be conditioned on Cloverland's agreement to revise its application in PSC Case No. U-20144 to propose a method of recalculating SRM charges using one or more of certain methodologies suggested by the Staff. In May 2018, the PSC entered an order approving Cloverland's motion for a stay of enforcement of the November 2017 opinion and order, subject to conditions.

In September 2018, Cloverland filed in the PSC a copy of a written settlement agreement reached between Cloverland and the Staff regarding the stay in this case and regarding Cloverland's pending annual SRM update case, PSC Case No. U-20144. The settlement agreement noted that the Staff had proposed an SRM rate schedule that avoided the negative

effect on Cloverland's members-customers and that used one of the possible methodologies set forth in the PSC's May 2018 stay order. Cloverland and the Staff agreed that Cloverland would voluntarily implement the SRM charges proposed by the Staff for service rendered on and after June 1, 2019. Cloverland was "to offset the SRM charges by identical reductions to its base rates to its full-service members/customers effective at the point in time the SRM charges become effective to make the SRM charges revenue neutral to its members/customers." The parties reserved the right to take different positions in future rate proceedings. The parties further agreed that the stay of the November 2017 opinion and order should be "extended and continued for service rendered through May 31, 2019." The settlement agreement provided that Cloverland would continue to pursue the instant appeal and that the settlement agreement did not constitute an admission or waiver regarding any of the parties' respective positions in this appeal. It was agreed that this Court's decision in this appeal would not affect the terms of the settlement agreement.

On appeal, Cloverland sets forth three arguments: (1) MCL 460.6w does not confer jurisdiction on the PSC to set SRM charges for full-service retail members-customers of an electric cooperative that is member-regulated, (2) the SRM charge was nonetheless unlawful because the sole customer taking from an AES is not paying an SRM charge, and therefore, a full-service customer cannot be subject to an SRM charge, and (3) the PSC acted unreasonably and unlawfully in setting SRM charges for Cloverland based on outdated cost studies and which ignored it existing rate design. We consider each argument in order.

## II. STANDARD OF REVIEW

This Court has explained:

> The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966). [*In re Application of Consumers Energy to Increase Electric Rates (On Remand)*, 316 Mich App 231, 236-237; 891 NW2d 871 (2016).]

Further, "[a] final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record." *Id*. at 237, citing Const 1963, art 6, § 28, and *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

This Court affords due deference to the administrative expertise of the PSC and may not substitute its judgment for that of the PSC. *Consumers Energy*, 316 Mich App at 237, citing *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

> We give respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute, and this Court will not overrule that construction absent cogent reasons. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103, 108; 754 NW2d 259 (2008). If the language of a statute is vague or obscure, the PSC's construction serves as an aid in determining the legislative intent and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. *Id.* at 103-104. However, the construction given to a statute by the PSC is not binding on us. *Id.* at 103. Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003). [*Consumers Energy*, 316 Mich App at 237.]

This Court has further explained:

> Ultimately, the statutory language itself is controlling, and this Court will neither abandon nor delegate its responsibility to determine legislative intent. Moreover, we review de novo issues of statutory interpretation, including the [PSC's] determinations regarding the scope of its own authority. In sum, when considering the construction given to a statute by an agency, our ultimate concern is the proper construction of the plain language of the statute regardless of the agency's interpretation, and our primary obligation is to discern and give effect to the Legislature's intent. [*In re Reliability Plans*, 325 Mich App at 221 (citations omitted).]

## III. ANALYSIS

### A. AUTHORITY UNDER MCL 460.6W TO SET SRM CHARGES

Cloverland first argues that MCL 460.6w does not confer jurisdiction on the PSC to set SRM charges for full-service retail members-customers of an electric cooperative that is member-regulated. We conclude that the PSC correctly determined that it possesses authority under MCL 460.6w to set SRM charges for full-service members-customers of a member-regulated electric cooperative such as Cloverland.

"The [PSC] has no common-law powers and possesses only the authority granted to it by the Legislature." *In re Reliability Plans*, 325 Mich App at 222. Further, this Court "strictly construe[s] the statutes that confer power on the [PSC], and that power must be conferred by clear and unmistakable language." *Id.* (quotation marks and citation omitted). Hence, "powers specifically conferred on an agency cannot be extended by inference; no other or greater power was given than that specified." *Id.* (quotation marks, ellipsis, and citation omitted).

The language of a statute provides the most reliable evidence of the Legislature's intent. *Coldwater v Consumers Energy Co*, 500 Mich 158, 167; 895 NW2d 154 (2017). "If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted." *Id.*, quoting *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). Statutory language is accorded its ordinary meaning within the context in which it is used and must be read harmoniously to give effect to the statute as a whole. *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012). "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *Coldwater*, 500 Mich at 167-168, quoting *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002).

> Statutes that relate to the same subject matter or share a common purpose are *in pari materia* and must be read together as one law to effectuate the legislative purpose as found in harmonious statutes. If two statutes lend themselves to a construction that avoids conflict, that construction should control. When two statutes are *in pari materia* but conflict with one another on a particular issue, the more specific statute must control over the more general statute. The rules of statutory construction also provide that a more recently enacted law has precedence over the older statute. This rule is particularly persuasive when one statute is both the more specific and the more recent. [*Parise v Detroit Entertainment, LLC*, 295 Mich App 25, 27-28; 811 NW2d 98 (2011) (quotation marks, ellipsis, brackets, and citations omitted).]

Under Act 167, which was enacted in 2008, a member-regulated electric cooperative has a general authority to set its own rates. See MCL 460.36(1) ("A cooperative electing to be member-regulated under this act shall, by board action, establish, maintain, and apply all rates, charges, accounting standards, billing practices, and terms and conditions of service in accordance with this act."); MCL 460.33 ("The purpose of this act is to allow the board of directors to elect member-regulation for rates, charges, accounting standards, billing practices, and terms and conditions of service."). But this general authority to self-govern is not absolute. For example, the PSC retains authority under Act 167 to set a member-regulated cooperative's rates for customers who choose to obtain service from an AES. See MCL 460.36(2).[4]

---

[4] In particular, MCL 460.36(2) provides:

> Notwithstanding the provisions of this act, the commission shall retain jurisdiction and control over all member-regulated cooperatives for matters involving safety, interconnection, code of conduct including, but not limited to, all relationships between a member-regulated cooperative and an affiliated alternative electric supplier, customer choice including, but not limited to, the ability of customers to elect service from an alternative electric supplier under 1939 PA 3, MCL 460.1 to 460.10cc, and the member-regulated cooperative's rates, terms, and conditions of service for customers electing service from an

-9-

Act 341, which was enacted in 2016, added MCL 460.6w, which sets forth an additional exception to a member-regulated electric cooperative's authority to self-govern. MCL 460.6w applies to electric providers. This statute expressly defines "[e]lectric provider" to include "[a] cooperative electric utility in this state." MCL 460.6w(12)(c)(*iii*). MCL 460.6w(3), which prescribes a specific formula for the PSC to use in establishing an SRM charge, states that the PSC shall "ensure that the resulting capacity charge does not differ for full service load and alternative electric supplier load[.]" This statutory language clearly and unmistakably authorizes the PSC to set an SRM charge with respect to member-regulated electric cooperatives, both for "full service load," i.e., for full-service members-customers, as well as for "alternative electric supplier load," i.e., for choice or ROA customers of an AES. Any other interpretation would render nugatory the statutory language requiring the PSC to use a specific formula and to "ensure that the resulting capacity charge does not differ for full service load and alternative electric supplier load[.]" MCL 460.6w(3).[5] Act 341, which was enacted in 2016, is more recent than Act 167, which was enacted in 2008. MCL 460.6w(3) is also a more specific provision because it addresses a specific component of rates, i.e., a capacity charge, whereas Act 167 addresses the general authority of member-regulated cooperatives to set rates. Hence, a member-regulated cooperative's general authority to set its own rates under Act 167 is subject to the exception set forth in MCL 460.6w(3) regarding the PSC's authority to set a capacity charge. Therefore,

> alternative electric supplier, service area, distribution performance standards, and quality of service, including interpretation of applicable commission rules and resolution of complaints and disputes, except any penalties pertaining to performance standards and quality of service shall be established by the cooperative's members when voting on the proposition for member-regulation or at an annual meeting of the cooperative.

[5] Cloverland says that the PSC "can assure that capacity costs are the same for full-service customers as for alternative energy customers by determining how those costs are recovered in [Cloverland's] current rates without altering those rates." But that argument makes no sense because MCL 460.6w(3) prescribes a specific formula to use in determining the SRM charge and requires the PSC to ensure that the SRM charge does not differ for full-service and AES customers. In order to follow the statutory requirements, the PSC necessarily must have the authority to set the SRM charge for both types of customers. Also, as the PSC convincingly explains in its brief in connection with the third issue, Cloverland's

> rates do not break out the amounts included for various capacity costs so it is impossible to know what full-service customers are actually paying for capacity under Cloverland's current rates. The fact that Cloverland's current rates cover all of its costs, including capacity costs, is not sufficient evidence to allow the [PSC] to ensure that the capacity charges paid by full-service customers are the same as the capacity charge set by the methodology mandated in Act 341. MCL 460.6w(3). The [PSC] did not err in requiring that Cloverland state the capacity charge in its full-service tariff so that the [PSC] can compare and ensure that full-service and ROA load pay the same amount for capacity.

Cloverland's argument is without merit, and the PSC had the authority to the set the SRM charge.

## B. SUBJECTING FULL-SERVICE CUSTOMERS TO AN SRM CHARGE

Cloverland also argues that the SRM charge was nonetheless unlawful because the sole customer taking from an AES—UP Paper—is not paying an SRM charge, and therefore, Cloverland, as a full-service customer, cannot be subject to an SRM charge. We conclude that the PSC correctly determined that it was required to impose the SRM charge on full-service customers regardless of whether the AES serving UP Paper makes the required capacity demonstration.

MCL 460.6w(3) states, in relevant part, "After the effective date of [Act 341], the commission shall establish a capacity charge as provided in this section." This determination must be conducted annually. See MCL 460.6w(3) (requiring a determination of an SRM charge to be conducted as a contested case and concluded "by December 1 of each year[]"). The PSC is required to "provide notice to the public of the single capacity charge as determined for each territory." MCL 460.6w(3). Further, "[t]he capacity charge must be applied to alternative electric load that is not exempt as set forth under subsection (6) and (7)." MCL 460.6w(3). In short, MCL 460.6w(3) requires the PSC to impose an SRM charge each year. There is no triggering mechanism that must be met before an SRM charge is imposed on full-service customers. Although an AES customer is exempt from paying the charge if the AES serving that customer has made the required capacity demonstration, see MCL 460.6w(3) and (6), there is no statutory language indicating that the exemption applies to full-service customers. The language of MCL 460.6w(3) directing the PSC to ensure that the "capacity charge does not differ for full service load and alternative electric supplier load[]" requires the charge to be the same for full-service customers and ROA customers, but this does not mean that a statutory exemption for customers of an AES must somehow be extended to full-service customers. Requiring a charge to be the same does not equate with expanding a statutory exemption. The PSC thus properly determined that Cloverland's full-service customers are required to pay the SRM charge regardless of whether the AES serving UP Paper met its capacity demonstration.

## C. SETTING SRM CHARGES

Finally, Cloverland argues that the PSC acted unreasonably and unlawfully in setting SRM charges for Cloverland based on outdated cost studies and ignoring its existing rate design. We conclude that this issue is moot, and in any event, the PSC did not act unreasonably or unlawfully in setting the SRM charge.

"This Court does not decide moot issues. A matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy." *Garrett*, 314 Mich App at 450 (quotation marks and citations omitted). Also, "[a]n issue becomes moot when a subsequent event renders it impossible for the appellate court to fashion a remedy." *Id.* (quotation marks and citation omitted). Here, the PSC's stay orders and the parties' settlement agreement have made it impossible for this Court to grant any relief on this issue. The PSC entered an initial stay order in May 2018, and subsequently extended the stay to May 31, 2019, after the parties settled the annual SRM update case regarding the SRM charge for service

-11-

rendered on and after June 1, 2019. As a result, no customer of Cloverland, whether full-service or ROA, will ever pay the particular charge ordered in the November 2017 opinion and order from which the present appeal arises. Because the issue is moot, this Court does not reach it. This case does not fall within the exception to the mootness doctrine for issues that are capable of repetition while evading review. See *City of Warren v Detroit*, 261 Mich App 165, 166 n 1; 680 NW2d 57 (2004) ("We will only review a moot issue if the issue is publicly significant and is likely to recur, yet also is likely to evade review."). The issue here is moot because of the stay orders and the parties' settlement; there is no indication that such events will recur and cause the issue to evade review.

Even if the issue was not moot, Cloverland has not established that the PSC acted unreasonably or unlawfully in setting the SRM charge set forth in the November 2017 opinion and order. Cloverland asserts that the 2015 COSS upon which the PSC relied was out of date, but the COSS was submitted by Cloverland itself, and there was not sufficient updated evidence upon which the PSC could rely in making its statutorily required calculations. Cloverland also says that capacity costs were already embedded in Cloverland's existing rates, but as noted in the first issue, the PSC was required by MCL 460.6w(3) to use a specific formula and to ensure that the SRM charge does not differ for full-service customers and AES customers. There is no indication that Cloverland broke down the capacity costs purportedly embedded in its existing rates with sufficient clarity such that the PSC could carry out its statutory duty without setting a separate SRM charge. Further, as noted by the PSC, Cloverland was free to alter its existing rates to remove any embedded capacity costs after the PSC imposed the SRM charge.

Affirmed.

/s/ Thomas C. Cameron
/s/ Colleen A. O'Brien
/s/ Karen M. Fort Hood