*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PERRY JOHNSON,

Plaintiff,

v

BOARD OF STATE CANVASSERS, SECRETARY
OF STATE, and BUREAU OF ELECTIONS
DIRECTOR,

Defendants.

FOR PUBLICATION
June 1, 2022
9:00 a.m.

No. 361564

Before: K. F. KELLY, P.J., and M. J. KELLY and HOOD, JJ.

PER CURIAM.

In this expedited matter,[1] plaintiff, Perry Johnson, has filed an original complaint seeking a writ of mandamus compelling defendants, the Board of State Canvassers (the Board), Secretary of State, and Bureau of Elections Director (the Bureau and the Director, respectively),[2] to certify his name as a Republican candidate for the Office of Governor on the August 2, 2022 primary election. We conclude that Johnson has not carried his burden of establishing that he is entitled to a writ of mandamus, so we deny his complaint.

---

[1] *Johnson v Bd of State Canvassers*, unpublished order of the Court of Appeals (Docket No. 361564), entered May 27, 2022.

[2] The Director of Elections is appointed by the secretary of state and supervises the Bureau of Elections. MCL 168.32(1); MCL 168.34. The Director is "vested with the powers and shall perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." MCL 168.32(1). As "a nonmember secretary of the state board of canvassers," *id.*, the Director supervises the Bureau as it assists the Board in canvassing petitions.

-1-

## I. BASIC FACTS

In order to be included on the August 2, 2022 primary ballot as a prospective candidate for the Office of Governor, Johnson was required to submit nominating petitions that included the signatures of at least 15,000 registered electors. See MCL 168.53 and MCL 168.544f. Prior to the applicable filing deadline, he submitted nominating petitions that included a total of approximately 23,193 signatures, each of which was purportedly the signature of a different registered elector. Thereafter, on May 23, 2022, the Bureau's staff issued a report recommending that Johnson's petition be determined insufficient.[3] The staff report included the following summary:

**NUMBER OF VALID SIGNATURES REQUIRED**: 15,000 signatures.

**TOTAL FILING**: 23,193 signatures.

**RESULT OF REVIEW**: 13,800 facially valid signatures, 9,393 invalid signatures.

| | | |
|---|---|---|
| Total number of signatures filed | | 23,193 |
| Not registered | *Less:* | 68 |
| Jurisdiction errors (no city in county known by name given by signer, dual jurisdiction entry, jurisdiction name given by signer does not align with address) | *Less:* | 1,336 |
| Date errors (no date given by signer, date of birth entered, or date given by signer is later than circulator's date of signing) | *Less:* | 269 |
| Address errors (no street address or rural route given) | *Less:* | 81 |
| Circulator errors (circulator did not sign or date petition, etc.) | *Less:* | 239 |
| Signature errors (no signature or incomplete signature) | *Less:* | 15 |
| Miscellaneous errors (signatures of dubious authenticity where the petition signature does not match the signature on file or multiple signatures appear to have been written by the same individual, etc.) | *Less:* | 402 |
| Number of signatures on sheets submitted by fraudulent-petition circulators | *Less:* | 6,983 |

The point of contention in this matter is the 6,983 signatures that were invalidated because they were on sheets submitted by individuals that the Board determined to be fraudulent-petition

---

[3] Non-party Carol Bray filed a sworn complaint with the Board challenging the validity and genuineness of the signature on Johnson's nominating petitions. The Board, however, did not commence an investigation of her complaint because it had already determined that Johnson's nominating petitions were insufficient.

circulators.[4]  It is undisputed that, contrary to the traditional methodology employed to canvass a nominating petition, the Bureau used an additional approach due to the volume of signatures submitted by a number of petition circulators who appear to have engaged in widespread fraud across multiple petitions submitted on behalf of multiple candidates.  Specifically, the Bureau estimated that "at least 68,000 invalid signatures [were] submitted across 10 sets of nominating petitions," and that "[i]n several instances, the number of invalid signatures submitted by [the fraudulent-petition circulators] was the reason a candidate had an insufficient number of valid signatures."  The Bureau summarized the problem as follows:

> These petition sheets tended to display at least one of the following patterns:
>
> - An unusually large number of petition sheets where every signature line was completed, or where every line was completed but one or two lines were crossed out;
>
> - Many sheets showing signs of apparent attempts at "intentional" signature invalidity, including sheets where an entry listed a county in the "city or township" field, or a birth date rather than the date of signing in the "date" field;
>
> - An unusually large number of petition sheets that showed no evidence of normal wear that accompanies circulation, including folding, scuffing, minor water damage from rain, or any of the other characteristics that come from sheets being kept on clipboards and handled by multiple people in public or outdoor conditions.
>
> - Sheets that appeared to be "round-tabled" a practice in which a group of individuals passes around sheets with each individual signing one line on each sheet with handwriting different from the circulator's handwriting, in an attempt to make handwriting and signatures appear authentic and received from actual voters.
>
> - Sheets on which blank and completed lines were randomly interspersed, indicating that a sheet had been submitted "mid-round-table."  In such cases, a sheet was submitted even though the round-tabling process had not been completed.
>
> - Sheets where all ten lines had signatures and partial addresses or dates, but only a random subset were fully completed;

---

[4] Based on the record before this Court, it does not appear that any specific candidates or campaigns were aware of the activities of the individuals that were determined to have provided fraudulent signatures in connection with multiple nominating petition.  Nor does it appear that any civil actions or criminal charges have been brought against those individuals.

- Sheets on which every instance of the handwriting of certain letters across different signatory lines and sheets, including in the signatures themselves, was near-identical;

- Sets of sheets where the two or three distinct handwriting styles appeared on multiple sheets.

Based on these observations, staff began to compare signatures on the petitions to the [qualified voter file (QVF)]. During its review against the QVF, staff noticed the following:

- Discrepancies in the signature appearing on the petition sheet and the voter's signature appearing in the Qualified Voter File;

- An unusually high number of signatures corresponding to addresses where the voter was previously but not currently registered to vote;

- An unusually high number of signatures corresponding to formerly registered voters whose registrations were cancelled because the voter had died months or years prior to the date of the signature;

- Several errors in the voters' names where the name on the petition was spelled differently than the voters' registration in the QVF or where the petition used the voter's middle name or a diminutive or nickname;

- The jurisdictions listed almost always utilized the mailing address versus the actual jurisdiction.

After review, staff identified across multiple drives numerous circulators that had submitted fraudulent signatures and assembled a list of the names of circulators who had signed multiple petition sheets consisting of invalid signatures. These patter[n]s suggest to staff that the fraudulent circulators were utilizing an outdated mailing list obtained from some source. As more nominating petitions were submitted, staff continued to identify fraudulent sheets and build the list of circulators consistently submitting such sheets.

In order to address the apparent widespread fraud, the Bureau used a modified version of its standard approach to process nominating petitions. The Bureau explained its modified approach in a May 23, 2022 staff report on fraudulent nominating petitions. That report stated:

The Bureau's standard approach to processing nominating petitions has two stages. First, staff "face reviews" every petition sheet and signature for facial compliance with the Michigan Election Law, which includes: checking that the signature header and the circulator certificate are properly completed; that each signature is accompanied by an address, name, and date; that the city or township in which the signer claimed to reside was in the county written on the signature header; and other issues required for a facially valid sheet or signature. During past

face reviews, the Bureau has identified scattered instances of signatures of dubious authenticity, and upon review of the signature removed these from the total of valid signatures[.]

At the conclusion of stage one (face review), staff determines how many signatures have been disqualified for facial errors and . . . calculates the balance of remaining potential valid signatures remaining.  If the candidate now has fewer signatures than the total required to qualify, the Bureau will recommend that the Board determine the petitions insufficient.  If the candidate has more signatures remaining than the required number to qualify, the Bureau notes the difference (the "cushion").

In the second stage, Bureau staff then reviews any challenges to the petition's sufficiency. . . .

* * *

Because, in the past, the number of signatures of dubious authenticity were typically scattered throughout petitions and relatively small in number, the Bureau has previously not developed a separate review procedure for fraudulent petition sheets.  Instead, the Bureau would review sheets and signatures individually if identified during face review or during a challenge.  However, because of the unprecedented number of fraudulent petition sheets consistent of invalid signatures identified during the initial review of petition sheets submitted this election cycle, and the fact that the same fraudulent-petition circulators submitted petition sheets for many different candidates, it was not practical to review these sheets individually during the course of ordinary face review and challenge processing.

Instead, staff utilized an additional step within the processing method described above.  Prior to face review, staff reviewed each candidate's petitions for petitions signed by circulators who were suspected of submitting fraudulent sheets. Signatures appearing on these fraudulent sheets were separated from the remaining petition sheets for each candidate.  To verify that these fraudulent petition sheets did not include sheets or individual signatures that were actually valid signatures submitted by registered voters, staff conducted a *targeted signature check* of signatures across each circulator's sheets for each candidate to confirm that these circulators' submissions in fact consisted of fraudulent sheets with invalid signatures.[5]

The Bureau determined that all *reviewed* signatures appearing on sheets signed by the fraudulent-petition circulators were invalid.  After petition sheets submitted by the fraudulent-petition circulators were identified, the number of

---

[5] If this targeted review showed that a circulator had collected legitimate signatures, the circulator was removed from the list of fraudulent-petition circulators and signatures appearing on that circulator's petition sheets were added back into the universe of potentially valid signatures.

signatures appearing on those sheets was totaled and that total was subtracted from the number of signatures submitted by the candidate. If the candidate had enough potentially valid signatures to [sic] remaining to avoid immediate disqualification, the petitions were then put through the face review and challenge process described above. If not, Bureau recommended the Board determine the petitions insufficient.

Staff determined that the fraudulent petition sheets consisted of signatures that were invalid because the petitions consisted of names of voters who were not registered in the appropriate jurisdiction, or names of valid registered voters with forged signatures. Staff were able to identify fraudulent petition sheets using a combination of methods. First, staff noted that the signatures, names, addresses, and dates on many of the fraudulent sheets were obviously signed by one or a small number of individuals which can be seen in the [sic] Upon noticing these similarities in handwriting, staff began to check individual signatures and voter information against the Qualified Voter File.

Review showed that a significant percentage of alleged signatories were no longer registered in the jurisdiction because they had moved from the address marked on the petition sheet months or years before. Review also revealed that a number of the alleged signatories' registrations were cancelled because the individual had died prior to the date of signing. None of the reviewed signatures appearing on these petition sheets had redeeming qualities demonstrating a match when compared with the signature on file. [Footnote in original; emphasis added.]

With respect to Johnson's nominating petitions, the May 23, 2022 staff report addressed the impact of the fraudulent-petition circulators as follows:

Staff reviewed each petition sheet submitted by Mr. Johnson. During that review, staff flagged each sheet which was signed by a fraudulent-petition circulator. For additional information on sheets submitted by fraudulent-petition circulators, see *Staff Report on Fraudulent Nominating Petitions*.

In total, staff's review of Mr. Johnson's petition sheets identified 9,393 invalid signatures and 13,800 facially valid signatures, which dropped him below the 15,000 threshold and rendered him ineligible for the ballot.

Signatures from the following fraudulent-petition circulators were included in Mr. Johnson's submission:

| | |
|---|---|
| Davon Best | 60 signatures |
| Antonio Braxton | 177 signatures |
| Brianna Briggs | 254 signatures |
| Nicholas Carlton | 404 signatures |
| DeShawn Evans | 401 signatures |
| Jehvon Evans | 70 signatures |
| Justin Garland | 203 signatures |
| LeVaughn Hearn | 108 signatures |

| | |
|---|---|
| Brianna Heron | 450 signatures |
| Aaliyah Ingram | 154 signatures |
| Niccolo Mastromatteo | 97 signatures |
| Giovannee Smith | 460 signatures |
| Ryan Snowden | 1,077 signatures |
| Trevon Stewart | 29 signatures |
| Stephen Tinnin | 1,034 signatures |
| Yazmine Vasser | 576 signatures |
| Diallo Vaughn | 440 signatures |
| William Williams | 989 signatures |
| | 6,983 signatures |

Distinctive characteristics of petition sheets submitted by fraudulent-petition circulators included all of the following:

**1.  Signatures from voters who have been canceled or have not lived at the address on the petition for years.**

Through its review, staff identified a number of fraudulent signatures that were purported to be from voters who had been canceled.  Voters were canceled for a variety of reasons which included moving out of state and death.  Several signatures also listed an address where the voter has not resided from at least one to eight years prior to signing.

\* \* \*

**2.  Misspelled names or addresses.**

In some cases, the voter's name is misspelled, either in the signature block or in the block for the voter's printed name.  Misspelling of the purported individual's own name is an indicator of fraud.  Although signatures do not need to be legible to be accepted, a large number of signatures in which the proffered signature appears to have a different spelling than the printed name is an indicator of fraud.

\* \* \*

**3.  Repeated use of an uncommon signature abbreviation.**

An additional anomaly is the use of a first name and last initial as a signature.  Using a first initial and last name (for example, J. Smith) is not uncommon; the inverse (John S.) is rare.  Nonetheless, this unusual combination was included throughout the fraudulent petition sheets . . . .

\* \* \*

**ADDITIONAL INVALID SIGNATURES IDENTIFIED DURING FACE REVIEW:**  As with all candidates, the staff initially conducted a face

review of Mr. Johnson's petition sheets. Substantial numbers of signatures were deemed invalid on face review based on the errors described above, with one of the largest numbers coming from jurisdictional errors. . . .

\* \* \*

The petition also included 402 signatures with miscellaneous errors, including signatures of dubious authenticity submitted by circulators other than those listed in the fraudulent-circulator report. For instance, Dulce Amaya Romero submitted 4 petition sheets which 40 signatures of dubious authenticity [sic].

\* \* \*

Mr. Johnson did not meet the threshold for certification to the ballot based on the staff's initial review.[6]

On May 26, 2022, the Board held a public meeting, at which it intended to "make a final determination on whether to accept the staff's recommendation." A motion was made to accept the staff's recommendation that Johnson's nominating petitions were "insufficient," and the Board deadlocked along partisan lines.[7] The next day, May 27, 2022, Johnson filed his instant complaint for mandamus, along with a brief in support and a motion seeking immediate consideration. This Court granted immediate consideration and ordered that, pursuant to MCR 7.206(D)(4), the matter would be submitted for decision on the briefs filed without oral argument.

## II. JURISDICTION

As explained in *Citizens for Protection of Marriage v Bd of State Canvassers*, 263 Mich App 487, 491-492; 688 NW2d 538 (2004):

This Court has jurisdiction to entertain a mandamus action against a state officer. MCR 7.203(C)(2); *Comm for Constitutional Reform v Secretary of State*, 425 Mich 336, 338 n 2; 389 NW2d 430 (1986); see also MCL 600.4401 (allowing a party to commence a mandamus action in the Court of Appeals). Whether the defendant had a clear legal duty to perform and whether the plaintiff had a clear legal right to

---

[6] In an affidavit submitted in support of the Board's answer to the complaint, the Director of the Bureau averred that, of the 6,983 signatures invalidated because they were submitted by the fraudulent-petition circulators, the Bureau checked 1,405 (approximately 20.1%) of the signatures against the qualified voter file. None of the signatures that were compared to the qualified voter file were determined to be valid.

[7] We conclude that, although the Board deadlocked on the issue of whether to find Johnson's petitions sufficient or insufficient, its inaction "constitutes an action, which is the equivalent of a determination." *Deleeuw v State Bd of Canvassers*, 263 Mich App 497, 506 n 4; 688 NW2d 847 (2004).

-8-

the performance of that duty are questions of law that we review de novo. See *In re MCI*, 460 Mich 396, 442–443, 596 NW2d 164 (1999).

## III. WRIT OF MANDAMUS

"The plaintiff bears the burden of demonstrating entitlement" to a writ of mandamus. *Id*. at 492. "Mandamus is a discretionary writ and an extraordinary remedy." *Comm to Ban Fracking in Mich v Bd of State Canvassers*, 335 Mich App 384, 394; 966 NW2d 742 (2021) (*Fracking*). "The writ is one of grace" and "equitable principles" apply. *Franchise Realty Interstate Corp v Detroit*, 368 Mich 276, 279; 118 NW2d 258 (1962). "The primary purpose of the writ of mandamus is to enforce duties created by law, where the law has established no specific remedy and where, in justice and good government, there should be one." *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 667; 425 NW2d 80 (1988).

> To obtain the extraordinary remedy of a writ of mandamus, the plaintiff must show that: (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result. [*Rental Props Owners Ass'n of Kent Co v Kent Co Treas*, 308 Mich App 498, 518; 866 NW2d 817 (2014).]

"[A] clear, legal right is one clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided." *Id*. at 519 (quotation marks and citation omitted). "A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 58 n 11; 832 NW2d 728 (2013) (quotation marks and citation omitted).

Johnson contends, somewhat inelegantly, that defendants have a clear, legal duty to certify his name for the ballot because he submitted at least 15,000 valid signatures across his nominating petitions. He notes, correctly, that signatures on petitions are presumed valid and that the burden is on the challenger to the signatures to prove by clear, convincing, and competent evidence that the signatures are invalid. See *Jaffee v Allen*, 87 Mich App 281, 285; 274 NW2d 38 (1978) and *Farm Bureau Mut Ins Co of Mich v Comm'r of Ins*, 204 Mich App 361, 365-366; 514 NW2d 547 (1994). He argues that defendants have a clear legal duty to invalidate signatures using only the procedure set forth in MCL 168.552(8) and (13).

MCL 168.552 sets forth relatively "detailed procedures for investigating and resolving complaints about nominating petitions," *Berry v Garrett*, 316 Mich App 37, 41; 890 NW2d 882 (2016), and it also sets forth the Board's "duties with regard to qualifying petitions," *Deleeuw v State Bd of Canvassers*, 263 Mich App 497, 500-501; 688 NW2d 847 (2004). The Board's duty is, in short, "to determine whether the signatures on the petitions are valid, including those of the people who circulate the petitions, whether they are the signatures of registered voters, and whether there are sufficient valid signatures to certify the petitions." *Id*.

Relevant to this matter, MCL 168.552(8) provides:

>      (8) . . . Upon the receipt of the nominating petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered electors. *Subject to subsection (13), for the purpose of determining the validity of the signatures, the board of state canvassers may cause a doubtful signature to be checked against the qualified voter file or the registration records by the clerk of a political subdivision in which the petitions were circulated.* If the board of state canvassers receives a sworn complaint, in writing, questioning the registration of or the genuineness of the signature of the circulator or of a person signing a nominating petition filed with the secretary of state, the board of state canvassers shall commence an investigation. *Subject to subsection (13), the board of state canvassers shall verify the registration or the genuineness of a signature as required by subsection (13).* If the board is unable to verify the genuineness of a signature on a petition, the board shall cause the petition to be forwarded to the proper city clerk or township clerk to compare the signatures on the petition with the signatures on the registration record, or in some other manner determine whether the signatures on the petition are valid and genuine. The board of state canvassers is not required to act on a complaint respecting the validity and genuineness of signatures on a petition unless the complaint sets forth the specific signatures claimed to be invalid and the specific petition for which the complaint questions the validity and genuineness of the signature or the registration of the circulator, and unless the complaint is received by the board of state canvassers within 7 days after the deadline for filing the nominating petitions. . . .

The first emphasized sentence affords the Board discretion to "cause a doubtful signature to be checked" either "against the qualified voter file" or "the registration records by the clerk of a political subdivision in which the petitions were circulated." Thus, although the first emphasized sentence allows some leeway, that leeway is tempered by the requirements of § 552(13). The second emphasized sentence mandates when verifying "the registration or the genuineness of a signature," the Board must comply with § 552(13). MCL 168.552(13) provides:

>      (13) *The qualified voter file may be used to determine the validity of petition signatures by verifying the registration of signers.* If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote, there is a rebuttable presumption that the signature is invalid. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote in the city or township designated on the petition, there is a rebuttable presumption that the signature is invalid. *The qualified voter file shall be used to determine the genuineness of a signature on a petition.* Signature comparisons shall be made with the digitized signatures in the qualified voter file. The county clerk or the board of state canvassers shall conduct the signature comparison using digitized signatures contained in the qualified voter file for their respective investigations. If the qualified voter file does not contain a digitized signature of an elector, the city or the township clerk shall compare the petition signature to the signature contained on the master card. [Emphasis added.]

-10-

The plain language of MCL 168.552(13), therefore, allows the Board the discretion to use or not use the qualified voter file when verifying the registration of signers, but requires the Board use the qualified voter file when determining "the genuineness of *a* signature on a petition." The phrase "a signature" is singular. Johnson contends that, as a result, the Board had a clear, legal duty to check each and every signature against the qualified voter file before it could deem the signature invalid. Because the targeted signature check resulted in the Board not checking each and every purportedly invalid signature against the qualified voter file, Johnson believes that he is entitled to relief. His argument, however, does not properly account for MCL 168.544c. As relevant here, under MCL 168.544c(8), "[a]n individual shall not . . . [s]ign a petition with a name other than his or her own," Under MCL 168.544c(10), "[a]n individual shall not sign a petition with multiple names." The fraudulent-petition circulators are individuals and, based on the record before this Court, there is evidence that they signed Johnson's nominating petitions with names other than their own and that they signed his nominating petitions with multiple names. MCL 168.544c(11) provides:

> (11) If after a canvass and a hearing on a petition under section 476 or 552 the board of state canvassers determines that an individual has knowingly and intentionally failed to comply with subsection (8) or (10), the board of state canvassers may impose 1 or more of the following sanctions:

> (a) Disqualify obviously fraudulent signatures on a petition form on which the violation of subsection (8) or (10) occurred, *without checking the signatures against local registration records*.

> (b) Disqualify from the ballot a candidate who committed, aided or abetted, or knowingly allowed the violation of subsection (8) or (10) on a petition to nominate that candidate. [Emphasis added.]

Based on the record before this Court, it is apparent that, after a canvass and hearing on a petition under MCL 168.552, the Board determined that several individuals—the fraudulent-petition circulators—knowingly and intentionally failed to comply with MCL 168.544c(8) and (10). As a result, the Board had the discretion to disqualify their obviously fraudulent signatures without checking the signatures against local registration records. The Board, therefore, had a clear legal duty to investigate, but it did not have a clear legal duty to conduct a comparison of each fraudulent signature against the qualified voter file. Likewise, because the Board had the discretion to not check each and every signature submitted by the fraudulent-petition circulators, the act Johnson is seeking to compel defendants to perform is not ministerial in nature. See *Hillsdale Co Senior Servs, Inc*, 494 Mich at 58 n 11. Because Johnson bears the burden of demonstrating his entitlement to the requested writ, see *Citizens for Protection of Marriage*, 263 Mich App at 492, we conclude that his failure to show that the act requested is ministerial and his failure to show a clear legal duty on the part of the Board are fatal to his claim.[8]

---

[8] We do not reach the merits of Johnson's due process claim as it is not properly addressed via mandamus. However, we note that he was provided with the names of each of the fraudulent-

For those reasons, Johnson's complaint for mandamus is denied on the merits. This opinion constitutes our final judgment in this case, see MCR 7.215(E)(1), and this judgment shall have immediate effect pursuant to MCR 7.215(F)(2). Given that the instant case involves questions of significant public interest, no taxable costs are awarded. MCR 7.219(A).

/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly
/s/ Noah P. Hood

---

petition circulators, was told how many signatures they had collected that were invalidated, and was made aware that each and every signature submitted by those individuals have, in fact, been invalidated. Based on that information, it is clear that he was provided with notice as to what signatures were being invalidated and the basis for which they were being invalidated. He was also provided with a meaningful opportunity to challenge the finding of invalidity at the May 26, 2022 hearing before the Board. See *Spranger v City of Warren*, 308 Mich App 477, 483; 865 NW2d 52 (2014) ("At a minimum, due process requires notice and an opportunity to be heard in a meaningful time and manner.").